T.C. Memo. 2012-35


UNITED STATES TAX COURT


ESGAR CORPORATION, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 23676-08, 23688-08,     Filed February 6, 2012.
            23689-08.


        Ps granted qualified conservation easements to a
qualified conservation organization in 2004, reporting
noncash charitable contributions on their respective
2004 tax returns.  R determined deficiencies in income
tax, based in part on R's determination that Ps had
overstated the value of the conservation easements.  R
also determined sec. 6662(a), I.R.C., accuracy-related
penalties against the Holmeses and the Tempels.

        Held:  Ps are liable for the income tax
deficiencies to the extent redetermined herein as the
result of overvaluing the contributed conservation
easements.

_____

        [1]On Aug. 28, 2009, cases of the following petitioners were
consolidated herewith for purposes of trial, briefing, and
opinion:  Delmar L. and Patricia A. Holmes, docket No. 23688-08;
and George H. and Georgetta Tempel, docket No. 23689-08.

Held, further, the Holmeses and the Tempels are not liable for sec. 6662(a), I.R.C., accuracy-related penalties.


James R. Walker, Justin D. Cumming, and Christopher D. Freeman, for petitioners.

Sara Jo Barkley and Tamara L. Kotzker, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Petitioners are:  Esgar Corp. (Esgar), a Colorado corporation which filed Forms 1120, U.S. Corporation Income Tax Return, for the 2004, 2005, and 2006 tax years; Delmar L. and Patricia A. Holmes (the Holmeses); and George H. and Georgetta L. Tempel (the Tempels).  The Holmeses and the Tempels both filed joint Forms 1040, U.S. Individual Income Tax Return, for the 2004, 2005, and 2006 tax years.  In 2004 Esgar, the Holmeses, and the Tempels each donated a qualified conservation easement, reporting on Forms 8283, Noncash Charitable Contributions, fair market values of $570,500, $867,500, and $836,500, respectively.  Because of the limitations of section 170(b)(1)(A) and (2)(A), petitioners deducted only a portion of the reported contributions on their 2004 tax returns and carried the rest forward.[2]

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court
(continued...)

As a result of the donations, petitioners each also received transferable Colorado State income tax credits (State tax credits). They all sold a portion of their State tax credits in 2004. Esgar and the Tempels reported the proceeds from the sale of their State tax credits as capital gain; the Holmeses reported their proceeds as ordinary income.

Respondent issued Esgar and the Tempels notices of deficiency dated June 26, 2008, and issued the Holmeses a notice of deficiency dated June 27, 2008. In the notices of deficiency respondent determined, inter alia, that the conservation easements were valueless and that any proceeds from the sales of the State tax credits should be reported as ordinary income.

The determined tax deficiencies, additions to tax, and penalties were as follows

Esgar

| Year | Deficiency | Penalty Sec. 6662(a) | Addition to Tax[1] Sec. 6651(a)(1) |
|------|-----------|----------------------|-----------------------------------|
| 2004 | $9,741 | --- | $488.70 |
| 2005 | 11,990 | $2,398.00 | 1,199.02 |
| 2006 | 10,626 | 2,125.20 | --- |

[1]Respondent concedes Esgar is not liable for the sec. 6662(a) penalty for the 2005 and 2006 tax years, and Esgar concedes it is liable for the sec. 6651(a)(1) addition to tax for the 2004 and 2005 tax years.

[2](...continued)
Rules of Practice and Procedure.

The Holmeses

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $31,830 | $6,366.00 |
| 2005 | 24,572 | 4,914.00 |
| 2006 | 25,894 | 5,178.80 |

The Tempels

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2004 | $69,389 | $13,877.60 |
| 2005 | 24,292 | 4,858.40 |

On August 3, 2009, respondent filed a motion for partial summary judgment in Tempel v. Commissioner, docket No. 23689-08. On August 31, 2009, the Tempels filed a cross-motion for partial summary judgment. The issue was whether the gain from the sale of the State tax credits should be reported as ordinary income or as capital gain, whether the Tempels had any basis in their State tax credits. This Court held, in Tempel v. Commissioner, 136 T.C. 341 (2011), inter alia, that the State tax credits were capital assets, the Tempels did not have any basis in their State tax credits, and that the Tempels' holding period in the State tax credits was insufficient to qualify for long-term capital gain treatment.

We do not address any issues in this opinion that were resolved by our Opinion in Tempel. After concessions, the issues left for decision are: (1) The fair market value (FMV) of the

qualified conservation easements petitioners granted; (2) whether the Holmeses are liable for section 6662(a) accuracy-related penalties for their 2004, 2005, and 2006 tax years; and (3) whether the Tempels are liable for section 6662(a) accuracy-related penalties for their 2004 and 2005 tax years. As more thoroughly explained infra, in deciding the FMV of the conservation easements, we must determine whether the land on which the easements were granted was better suited for gravel mining or for agriculture.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and accompanying exhibits are hereby incorporated by reference into our findings. At the time it filed its petition, Esgar's principal place of business was in Colorado. At the time they filed their petitions, the Holmeses and the Tempels resided in Colorado.

I. Holly Property

In 1987 Esgar, the Holmeses, the Tempels, and Kelling Fine Foods, Inc. (Kelling Fine Foods), each acquired an undivided, one-fourth interest in just over 2,200 acres of real property near Holly, Colorado (Holly property). As of 1998 the Colorado Division of Minerals and Geology had granted permission for mining gravel, rock, and sand on 1,479 acres of the Holly property (1998 gravel permit).

A.  Jensen Property

On January 20, 1998, petitioners and Kelling Fine Foods sold 661.75 acres of the western portion of the Holly property along with 455 shares of Buffalo Mutual Irrigation Co. (BMIC) to Robert C. and Tanya Jensen for $500,000 (Jensen property).[3]  A substantial portion of the acreage approved for mining by the 1998 gravel permit was on the Jensen property.  In the sale, petitioners and Kelling Fine Foods reserved all of the gravel, sand, and mineral rights in the Jensen property, subject to a January 20, 1998, repurchase agreement (repurchase agreement).

Pursuant to the repurchase agreement, if petitioners or Kelling Fine Foods elected to mine any portion of the Jensen property before January 20, 2003, they had to repurchase the portion mined for $1,250 per crop acre.  If they elected to mine any portion after January 20, 2003, they had to repurchase the portion mined at a price "determined by a licensed Colorado appraiser plus thirty percent (30%), but never more than $1,500.00 per crop acre."

---

[3]Water rights are the right to the use of water.  Under Colorado water law, the right to use the waters of the State is based on the priority of a party's appropriation for a specified amount of water, at a specified location, for specified uses.  Water rights may be held, as here, by a mutual irrigation company or a ditch company in which the users of the water own shares entitling them, unless otherwise expressly provided, to a pro rata portion of the company's water on the basis of the number of shares owned as a percentage of all the shares in the company.

B. <u>Midwestern Farms Property</u>

The Holly property less the Jensen property is referred to by the parties and this Court as the "Midwestern Farms Property".[4]  The Midwestern Farms property consists of approximately 1,560 acres and is in Prowers County, Colorado, west of Holly, Colorado, between U.S. Highway 50 and the Arkansas River.  Prowers County is in southeastern Colorado, approximately 200 miles southeast of Denver.

There is public access to the Midwestern Farms property via Prowers County Road, farm roads, and U.S. Highway 50.  The Burlington Northern Santa Fe (BNSF) railroad traverses the Midwestern Farms property, and there is a rail spur on the Midwestern Farms property.

II. <u>Midwestern Farms Gravel Pit</u>

A portion of the Midwestern Farms property and the Jensen property is operated as an alluvial gravel pit (Midwestern Farms

--------

[4]In April 2002 the Holmeses transferred title to their undivided 25-percent interest in the Midwestern Farms property to the Delmar L. Holmes Trust and the Patricia A. Holmes Trust.  As a result, the Delmar L. Holmes Trust owned an undivided one-eighth interest in the Midwestern Farms property and the Patricia A. Holmes Trust owned an undivided one-eighth interest in the Midwestern Farms property.  We continue to refer to these interests as the Holmes property.

Gravel Pit).[5]  The Midwestern Farms property and the Midwestern Farms Gravel Pit are managed by the Midwestern Farms Partnership.

Eastern Colorado Aggregates, RLLLP (E. Colorado Aggregates), has operated the Midwestern Farms Gravel Pit, pursuant to a lease with the Midwestern Farms Partnership, since at least 1999. Originally, the royalty rate paid to the Midwestern Farms Partnership by E. Colorado Aggregates was 35 cents per ton for all rock and gravel sold and 17.5 cents per ton of any sand and fill dirt sold.

By an agreement dated February 28, 2004, and effective January 1, 2004, the Midwestern Farms Partnership renewed its lease agreement with E. Colorado Aggregates (E. Colorado Aggregates lease).  The E. Colorado Aggregates lease allowed E. Colorado Aggregates to mine up to 1,470 acres of the portion of the Midwestern Farms property and Jensen property permitted by the 1998 gravel permit.  Beginning July 1, 2004, the royalty rate became 45 cents per ton for all rock and gravel sold and 22.5 cents per ton for any sand and fill dirt sold.

---

[5]For our purposes, a gravel pit is a mine where aggregate is extracted from an open pit.  Aggregate is defined as "minerals such as sand, gravel, and crushed stone.  Aggregate is often divided into two or more sizes including fine and coarse, which when added to cement and water in appropriate proportions, produces concrete.  Sand is considered a fine aggregate and stone or gravel a coarse aggregate."  Throughout this opinion we will use aggregate, rock, and gravel interchangeably.

The table below lists the tons of aggregate extracted from the Midwestern Farms Gravel Pit and the amounts of royalties received by the Midwestern Farms Partnership from E. Colorado Aggregates from 1999 through 2004:

| Year | Approximate Tons Extracted | Royalties Received |
|------|------|------|
| 1999 | --- | $80,361.55 |
| 2000 | --- | 150,489.88 |
| 2001 | 590,671 | 196,382.77 |
| 2002 | 519,013 | 177,017.06 |
| 2003 | 596,479 | 203,111.63 |
| 2004 | 998,586 | 390,735.21 |

## III. Other Gravel Pits

### A. Prowers County

The Midwestern Farms Gravel Pit, the J-S Pit, the Hardscrabble Pit, and the S-C Pit rank as the four largest wet gravel pits in Prowers County. The Midwestern Farms Gravel Pit is the largest. The J-S Pit, the Hardscrabble Pit, and the S-C Pit are operated by Carder, Inc. (Carder Company), owned by Ronald D. Peterson. In addition to these three pits in Prowers County, the Carder Company also operates a pit in western Kansas, just over the Kansas-Colorado State line, known as the Coolidge Pit.

According to Mr. Peterson, the Carder Company sold approximately 540,000 tons of aggregate in 2002 and 570,000 tons

in 2003 and 2004.  The following table shows the acres permitted and approximate tons of aggregate extracted from the four major Prowers County pits in 2003 and 2004.

| Pit | Acres Permitted | Tons Extracted 2003 | Tons Extracted 2004 |
|---|---|---|---|
| Midwestern Farms | 1,479 | 596,479 | 998,586 |
| J-S | 120 | 100,093 | 45,432 |
| Hardscrabble | 276[1] | 47,566 | 57,116 |
| S-C | 665 | 180,496 | 179,680 |
| Total | 2,540 | 924,634 | 1,280,814 |

[1]On the basis of Property Declaration Schedules filed by Mr. Peterson for the Hardscrabble Pit, we conclude that sometime in 2006 or 2007 the permitted area was extended to cover 406 acres.

Gravel from Prowers County is used within an approximate 100- to 150-mile radius around Prowers County, in areas including western Kansas, east-central and northeast Colorado, southwest Nebraska, northeast New Mexico, and the Oklahoma and Texas panhandles.  Some gravel is backhauled out of Prowers County on semi-tractor trucks bringing corn into Prowers County.[6]  Gravel was not being transported from Prowers County to the Front Range

[6]Backhauling occurs when a company hauls a primary commodity from a point of origin to a point of destination and then is able to "backhaul" a second commodity on the return trip back to the original point of origin rather than make a "deadhead" return. Backhauling helps reduce transportation costs in both directions.

Corridor, nor was any gravel being backhauled out of Prowers County via rail in 2004 or 2009, when trial was held.[7]

B.  District 3

The U.S. Geological Survey keeps estimates of historical Colorado aggregate production.  It classifies Prowers County, along with 14 other counties, as District 3.  The following table shows District 3's sand and gravel production for 2000-2003:

| Year | Tons of Aggregate |
|------|-------------------|
| 2000 | 1,499,143 |
| 2001 | 2,171,553 |
| 2002 | 1,884,952 |
| 2003 | 1,884,952 |

IV.  Donations of the Conservation Easements

A.  Brian Wurst

Brian Wurst, a certified public accountant (C.P.A.), assisted petitioners in structuring the donations of the conservation easements.  Mr. Wurst has a bachelor of science degree in business administration from Kansas State University. He is a member of Kennedy & Coe, C.P.A.s (Kennedy & Coe), has worked as a C.P.A. in southeastern Colorado since 1984, and has

_____

[7]The Front Range Corridor lies along the eastern side of the Rocky Mountains in Colorado and Wyoming and includes most of the Colorado population and the cities of Cheyenne, Denver, Longmont, Loveland, Broomfield, Thornton, Aurora, Lakewood, Golden, Centennial, Fort Collins, Colorado Springs, Boulder, Pueblo, Colorado City, and Trinidad.

assisted petitioners with their tax matters for approximately 25 years.

Mr. Wurst first became familiar with conservation easements in 2001 when the State of Colorado passed laws providing for benefits to taxpayers who granted qualifying conservation easements on their property. Kennedy & Coe's in-house tax attorneys studied the Federal and State laws regarding conservation easements and then used an outside law firm to confirm their understanding on both the Federal and State levels.

Mr. Wurst first discussed the donation of conservation easements with petitioners in the fall of 2003. He spent approximately 8 months talking with petitioners about the implications of granting conservation easements on their properties and approximately 4 months putting the conservation easements in place. While Mr. Wurst advised petitioners that "in our professional opinion, we could meet the requirements of the Code sections and related regulations", he did not advise that they make charitable conservation easement contributions. It was petitioners who ultimately made the decision to enter into the conservation easements.

B. Transfers of Property

On December 2, 2004, approximately 163 acres of the eastern portion of the Midwestern Farms property was transferred to Esgar, the Holmeses, and the Tempels via a series of like-kind

exchanges and quitclaim deeds.[8]  Afterwards, Esgar and the Tempels each owned 54.34 acres and 11-2/3 shares of BMIC, and the Holmeses owned 54.35 acres and 11-2/3 shares of BMIC (collectively, the subject properties).

The subject properties were zoned irrigated, agricultural and had historically been used as irrigated and nonirrigated farmland.  There was physical access to all three properties, but only the Holmes property had legal access.  The subject properties were not permitted for any mining, but the parties stipulated that absent the donations it was likely that the necessary permits to mine could have been obtained.

C.  Donations

On December 17, 2004, Esgar, the Tempels, and the Holmeses (or their revocable trusts) each donated a conservation easement on the subject properties to the Greenlands Reserve (collectively the conservation easements).

The terms of the conservation easements grant and convey easements in perpetuity to the Greenlands Reserve, providing it with the  rights to preserve the natural and open space conditions and protect the wildlife, ecological, and environmental values and water quality characteristics of the

---

[8]The stipulation of facts par. 14 indicates warranty deeds, but the deeds themselves are quitclaim deeds without warranty.

property.  The conservation easements specifically prohibit the mining or extraction of sand, gravel, rock, or any other mineral.

V.   Appraisals

     A.   Core Sampling and J.A. Cesare

     In September 2004, before the conservation easements were granted, petitioners retained the geotechnical engineering firm of J.A. Cesare and Associates, Inc. (Cesare), to perform core sampling on the subject properties in order to determine the potential sand and gravel resources beneath them.  Using Cesare's findings and reports, Dr. Charles E. Grey and his associate Brett Schafer of the geological firm of Charles E. Grey and Associates opined on the quantity and quality of gravel underneath the subject properties.

     B.   William Victor (Bill) Milenski

     Petitioners engaged Bill Milenski Appraisal Service, Inc. (Mr. Milenski), to perform an original appraisal of the conservation easements to be used to substantiate the reported charitable contributions on their tax returns.  Mr. Wurst testified that he had performed due diligence before he hired Mr. Milenski.  Mr. Wurst concluded Mr. Milenski had an extensive history in performing appraisals and "a very credible and conservative reputation" as an appraiser.

     Mr. Milenski determined that if the conservation easements had not been granted, the best use of the land would have been

for gravel extraction.  On this basis he determined that the FMV of the Holmes conservation easement was $867,500, the FMV of the Esgar conservation easement was $570,500, and the FMV of the Tempel conservation easement was $836,500.

Petitioners and Mr. Wurst reviewed the appraisals Mr. Milenski prepared.  Mr. Wurst was of the opinion that Mr. Milenski "took a reasonable approach to determine the value." Respondent does not challenge whether Mr. Milenski was a "qualified appraiser" at the time he prepared the appraisals or whether the appraisals were "qualified appraisals" pursuant to section 170(f)(11)(D).[9]

## VI.  Tax Returns

Esgar filed Forms 1120 for all years at issue.  The Holmeses and the Tempels filed Forms 1040 for all years at issue.[10]  On their respective 2004 tax returns, petitioners reported noncash charitable contributions and claimed charitable contribution deductions subject to the limitations of section 170(b)(1) and

---

[9]Mr. Milenski's license to practice real estate appraisal was suspended by the State of Colorado on May 1, 2008, "FOR OVERVALUING conservation easements".

[10]Pursuant to sec. 671, all of the income, deductions, and credits against tax attributable to the Delmar L. Holmes Trust and the Patricia A. Holmes Trust are reported on the Holmeses' individual Federal income tax returns.

(2), carrying the remainder forward.  The following table shows the charitable contributions reported and deductions claimed.[11]

| | Reported Charitable Contribution | 2004 Deduction | 2005 Deduction | 2006 Deduction |
|---|---|---|---|---|
| Esgar | $570,500 | $25,663 | $30,745 | $28,097 |
| Holmeses | 867,500 | 88,835 | 92,105 | 86,006 |
| Tempels | 836,500 | 201,487 | 78,380 | --- |

Respondent subsequently audited petitioners' returns, determining that the conservation easements were valueless and that the charitable contribution deductions should be denied in their entirety.  Respondent issued notices of deficiency, and petitioners timely petitioned this Court in response.  Trial was held November 4, 5, and 6, 2009, in Denver, Colorado.

---

[11]Also on their 2004 tax returns, Esgar reported an $18,000 capital gain from the sale of its State tax credits; the Holmeses reported $148,050 in ordinary income from the sale of their State tax credits, and the Tempels reported a $77,603 short-term capital gain from the sale of their State tax credits.  The Holmeses had received $164,625 in net proceeds but reduced this amount by $16,575 for expenses incurred.  The Tempels' $77,603 gain was based on an amount realized of $82,500 less "basis" of $4,897.  The Tempels also claimed a $6,233 deduction on Schedule A, Itemized Deductions, for costs related to the donation of the Tempel conservation easement.  The parties' disagreements over the characterization of the proceeds from the sales of the State tax credits were resolved in our previous Opinion in Tempel v. Commissioner, 136 T.C. 341 (2011), and are relevant here only with regards to respondent's allegation that the Holmeses and the Tempels are liable for sec. 6662(a) accuracy-related penalties.

OPINION

I. Burden of Proof

Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Moreover, the Commissioner's determination of value is normally presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Sealy Power, Ltd. v. Commissioner, 46 F.3d 382, 387 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1992-168.

However, pursuant to section 7491(a), the burden of proof on factual issues that affect the taxpayer's tax liability may shift to the Commissioner where the taxpayer complies with all requirements. Petitioners argue section 7491(a) shifts the burden of proof to respondent. Respondent argues petitioners did not meet the requirements for section 7491(a) to shift the burden of proof.

It is unnecessary for us to address the parties' disagreement and determine whether the burden has shifted because the parties have provided sufficient evidence for us to determine the value of the conservation easements and that determination is unaffected by section 7491(a). See Estate of Bongard v.

Commissioner, 124 T.C. 95, 111 (2005); Trout Ranch, LLC v.

Commissioner, T.C. Memo. 2010-283.  This Court has held that

> "In a situation in which both parties have satisfied
> their burden of production by offering some evidence,
> then the party supported by the weight of the evidence
> will prevail regardless of which party bore the burden
> of persuasion, proof or preponderance. * * *
> Therefore, a shift in the burden of preponderance has
> real significance only in the rare event of an
> evidentiary tie. * * *"

Knudsen v. Commissioner, 131 T.C. 185, 188 (2008) (quoting

Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005),

affg. T.C. Memo. 2003-212); see also Martin Ice Cream Co. v.

Commissioner, 110 T.C. 189, 210 n.16 (1998) (holding that the

allocation of the burden of proof was immaterial because the

court's conclusions were based on the preponderance of the

evidence).

II.  Applicable Law

Section 170 allows a taxpayer a deduction for a qualified

conservation contribution made during the taxable year.  Sec.

170(a), (c), (f)(3)(B)(iii), (h).  Respondent does not challenge

whether the conservation easements are "qualified conservation

contributions".  Rather, respondent disputes their value and

hence the amounts of the section 170 deduction petitioners are

allowed.

Section 1.170A-14(h)(3)(i), Income Tax Regs., provides in

relevant part:

> The value of the contribution under section 170 in the
> case of a charitable contribution of a perpetual
> conservation restriction is the fair market value of
> the perpetual conservation restriction at the time of
> the contribution.  See section 1.170A-7(c).  If there
> is a substantial record of sales of easements
> comparable to the donated easement (such as purchases
> pursuant to a governmental program), the fair market
> value of the donated easement is based on the sales
> prices of such comparable easements.  If no substantial
> record of market-place sales is available to use as a
> meaningful or valid comparison, as a general rule (but
> not necessarily in all cases) the fair market value of
> a perpetual conservation restriction is equal to the
> difference between the fair market value of the
> property it encumbers before the granting of the
> restriction and the fair market value of the encumbered
> property after the granting of the restriction. * * *

The parties agree that there are no sales of comparable easements and that the before and after method is the appropriate method to use in valuing the conservation easements.  This method requires us to calculate "the difference, if any, in the value of the [properties] with and without the easement".  Hilborn v. Commissioner, 85 T.C. 677, 688 (1985).

The parties agree the FMV of the Subject Properties after the conservation easements were granted (after value) was $24,000 for the Esgar and Tempel Properties and $27,000 for the Holmes property.  Their disagreement is the FMV of the Subject Properties before the conservation easements were granted (before value).

FMV is defined as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of any relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. "Valuation is not a precise science, and the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record." Kiva Dunes Conservation, LLC v. Commissioner, T.C. Memo. 2009-145.

The FMV of property must be evaluated considering the property's highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. While highest and best use can be any realistic, objective potential use of the property, it is presumed to be the use to which the land is currently being put absent proof to the contrary. United States v. L.E. Cooke Co., Inc., 991 F.2d 336, 341 (6th Cir. 1993); Symington v. Commissioner, 87 T.C. 892, 896 (1986). At the center of the parties' disagreement over the before value is their disagreement over the highest and best use of the Subject Properties before the easements were donated. Petitioners argue that it was gravel mining, whereas respondent argues that it was agriculture.

Where, as here, an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value. United States v. 69.1 Acres of Land, 942 F.2d 290, 292 (4th Cir. 1991); see also Stanley Works v. Commissioner, supra; United States v. Consol. Mayflower Mines, Inc., 60 F.3d

1470, 1476-1477 (10th Cir. 1995). "Any suggested use higher than current use requires both 'closeness in time' and 'reasonable probability'". Hilborn v. Commissioner, supra at 689. Any proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable" are to be excluded from consideration. Olson v. United States, 292 U.S. 246, 257 (1934).

Where the asserted highest and best use of property is the extraction of minerals, the presence of the mineral in a commercially exploitable amount and the existence of a market "that would justify its extraction in the reasonably foreseeable future" must be shown. United States v. 69.1 Acres of Land, supra at 292. "There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market." United States v. Whitehurst, 337 F.2d 765, 771-772 (4th Cir. 1964); see also United States v. 494.10 Acres of Land, 592 F.2d 1130, 1132 (10th Cir. 1979) (stating that "if the 'future' is beyond or very much beyond the 'near future,' the use becomes speculative").[12]

---

[12]We acknowledge that we are citing cases where the issue was just compensation in an eminent domain or condemnation setting. Fair market value "does not vary according to whether the taxpayer is seeking a charitable deduction for property contributed or an adequate and just compensation for property condemned." Klopp v. Commissioner, T.C. Memo. 1960-185.

III. Expert Opinions

Both parties have offered reports and testimony of expert witnesses to establish the before value and the highest and best use of the Subject Properties.

> We evaluate expert opinions in light of each expert's demonstrated qualifications and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). Where experts offer competing estimates of fair market value, we determine how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by an expert's opinions and may accept or reject an expert opinion in full or in part in the exercise of sound judgment. See Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, supra at 561-562. We may also reach a determination of value based on our own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Evans v. Commissioner, T.C. Memo. 2010-207.

There are three widely accepted methods of estimating the FMV for any property: Comparable sales, income capitalization (or discounted cashflow), and replacement cost. The parties disagree as to which method is appropriate in this case. Respondent's expert used the comparable sales method, which calculates FMV by looking for sales of property in the same market with similar characteristics that were made at arm's length. Petitioners' experts used the discounted cashflow (DCF) method, which calculates FMV by preparing a reasonable estimate of future income over time and discounting it to present value. We briefly summarize each expert's opinion.

A.  Petitioners' Expert--Gene Cruikshank

Mr. Cruikshank received a degree in agriculture from Colorado State University.  He has been a real estate broker since 1980, specializes in farm and ranch sales, and is licensed in Kansas, Oklahoma, Colorado, and New Mexico.  Mr. Cruikshank belongs to the Realtors Land Institute, a branch of the National Association of Realtors, and is an accredited land consultant. He has been an expert witness approximately seven or eight times before in both Federal and State court.

Petitioners rely on Mr. Cruikshank's opinion to argue no comparable sales existed.  Mr. Cruikshank analyzed small parcel sales in the Lower Arkansas Valley to determine whether any were bought for gravel production.[13]  He determined none were, stating he could not find "any small parcel (40-60 acres) sales that were sold either specifically for gravel or with the intent of future gravel development".  He stated "buyers * * * [were] more interested in crop production, water, soils, and location rather than gravel."  Mr. Cruikshank prepared a rebuttal report in which he stated he could not find any gravel-motivated sales for parcels of 160 acres or less.

---

[13]The area in which the Subject Properties are located is generally known as the Lower Arkansas Valley.

B.  Petitioners' Expert--Robert B. Frahme

Mr. Frahme's professional life has spanned 42 years and includes geological and appraisal work.  He is a certified general appraiser in Colorado, a certified professional geologist according to the American Institute of Professional Geologists, and a certified mineral appraiser according to the American Institute of Mineral Appraisers.  He is a member of the Appraisal Institute with MAI designation and is a member of the Society for Mining, Metallurgy, and Exploration.[14]  Mr. Frahme has been an expert witness before in both Federal and State courts.

Mr. Frahme opined that "The ultimate highest and best use" of the Subject Properties was gravel mining but did not reach "any conclusion of value".  Mr. Frahme's conclusion was conditioned on (1) the three properties' being assembled and (2) deferral of gravel mining to allow time for gravel markets to mature.  Assemblage was necessary because otherwise it would be difficult to mine the Esgar and Holmes Properties and "nearly impossible" to mine the Tempel property.  An adequate deferral period was necessary "because gravel markets are generally in equilibrium".  According to Mr. Frahme, demand in Prowers County

---

[14]The MAI designation is held by appraisers who are experienced in the valuation and evaluation of commercial, industrial, residential, and other types of properties and who advise clients on real estate investment decisions.

would increase when demand in the Front Range Corridor increased "given the available rail transport".

Mr. Frahme's theory was that gravel could be backhauled to the Front Range on trains bringing coal to a coal-fired power generation plant being built in the vicinity of the Subject Properties.[15]  Mr. Frahme determined rail transport to the Front Range was possible "By looking at a railroad map"; however, he did not consult or talk with any railroad employees.  He also did not consult coal companies to see whether they would consider backhauling gravel on coal trains.

Mr. Frahme failed to analyze supply.  He never considered gravel mines closer to the Front Range than Prowers County or whether the existing Prowers County mines could handle any potential increase in demand.  Mr. Frahme also never opined as to when demand would mature, despite his conclusion's resting on an adequate deferral period to allow for this to happen.  He simply concluded that "In a pessimistic case" (use of a higher discount rate), the highest and best use ceases to be mining after 14 to 15 years and in an "optimistic case" (use of a lower discount

---

[15]Mr. Frahme's report included a list of highway projects, including the "Ports to Plains Corridor", a proposed highway route to run from the Texas/Mexico border to Denver, and potential wind power and gas developments projects.  The report seemingly indicated that he thought these projects might also cause an increased demand for aggregate in Prowers County although there is no indication as to when demand would increase and by how much.

rate), the highest and best use ceases to be mining after 23 to 25 years.

C. Petitioners' Expert--Gerald K. Ebanks

Mr. Ebanks has been a geologist since 1985. He is a Certified Petroleum Geologist and a member of the American Association of Petroleum Geologists. He has previously testified as an expert in both this Court and U.S. District Courts. He was hired to give an opinion on the FMV of the Subject Properties.

According to Mr. Ebanks, gravel resources have intrinsic value and one need only multiply the quantity by the current market price to determine FMV. Mr. Ebanks was unaware that the before highest and best use of the Subject Properties was even at issue.

Using DCF analysis, Mr. Ebanks calculated the before value of the Subject Properties as gravel-producing properties in two scenarios: (1) As three individual gravel-producing properties and (2) as an assembled gravel-producing property. He concluded the following tons of aggregate were minable from each of the Subject Properties:[16]

---

[16]The amount of gravel that can be mined from a property depends in part on setbacks and pit walls. Setbacks are strips of unmined land between pit walls and property lines, and they can vary in size. Mr. Ebanks determined the setback and pit wall steepness on the basis of conversations with Prowers County gravel operators and by observing Prowers County mining methods, concluding a 50-foot setback and 70-degree pit wall were appropriate. In a reduced setback scenario, i.e., the Subject

(continued...)

| Property | Individual Operation | Assembled Operation |
|---|---|---|
| Esgar | 1,718,235 | 1,845,537 |
| Holmes | 2,490,324 | 2,797,195 |
| Tempel | 2,358,425 | 2,968,388 |
| Total | 6,566,984 | 7,611,120 |

According to Mr. Ebanks, production would begin on May 1, 2005, with the mines operating at full production by June. Mr. Ebanks concluded that approximately 10,000 tons of aggregate per month could be extracted from each property during the startup phase and 41,000 tons of aggregate per month from each property in full production. Mr. Ebanks used an effective combined, blended royalty rate of 43.58 cents per ton on the basis of the figures in the E. Colorado Aggregates lease and a discount rate of 9.10 percent.[17]

On the basis of the analysis described above, Mr. Ebanks determined the before value of the Subject Properties by discounting the anticipated royalty cashflow stream that could be realized from the operation of a gravel mining operation(s). His conclusions were:

---

[16](...continued)
Properties were assembled, no setback would be necessary on one side of the Esgar and Holmes Properties and on two sides of the Tempel property.

[17]Mr. Ebanks combined the royalty rates in the E. Colorado Aggregates lease of 45 cents per ton of rock anticipated to be sold and 22.5 cents per ton of sand anticipated to be sold to get a effective, combined, blended royalty rate of 43.58 cents per ton.

| Property | 50-Foot Setback | Reduced Setback |
|----------|-----------------|-----------------|
| Esgar | $625,013 | $657,711 |
| Holmes | 848,321 | 930,250 |
| Tempel | 812,718 | 972,606 |

Mr. Ebanks did not consider potential problems such as finding an operator for the gravel pit(s) and admitted he did not "know who might potentially quarry these pits". He did not perform a supply and demand analysis, nor did he know whether pit(s) on the Subject Properties could start up and compete effectively given the existence of other pits in the area.

D. Petitioners' Expert--John R. Emmerling

At trial petitioners' expert Mr. Emmerling was admitted as an expert, but respondent objected to the admissibility of his report. We allowed the report into evidence, subject to respondent's objection, reserving ruling on the objection. Mr. Emmerling graduated from the University of Colorado Boulder with a dual degree in real estate and marketing. He has worked in real estate for 37 years, including being involved in over 7,500 appraisals, 10 or 12 of which involved sand and gravel property. He is a Colorado Certified General Appraiser and is a member of the Appraisal Institute with MAI designation.

1. Mr. Emmerling's Report

Mr. Emmerling's report summarized, and in certain situations corrected, the conclusions of petitioners' other experts. In

addition to reviewing the other experts' reports, Mr. Emmerling reviewed the historic production records of gravel in Prowers County between 2000 and 2008 and the historic production records of gravel on the Midwestern Farms Gravel Pit.

Mr. Emmerling concluded gravel mining was the highest and best use of the Subject Properties. Like Mr. Frahme, his conclusion was contingent on the Subject Properties' being assembled and allowing for an adequate deferral period in order for demand in Prowers County to mature.

Mr. Emmerling agreed with Mr. Ebanks that approximately 7.6 million tons would be extracted from the Subject Properties as assembled. However, while Mr. Ebanks concluded each of the Subject Properties would produce 492,000 tons per year, Mr. Emmerling concluded all three Properties together would produce a total of 492,000 tons per year.

Like Mr. Ebanks, Mr. Emmerling used a discount rate of 9.10 percent and an effective royalty rate of 43.58 cents per ton. He performed a DCF analysis assuming a deferral of 4, 6, or 10 years. His DCF analysis was based on

> simply a what-if, that on delayed production I disagreed
> with Mr. Ebanks from the standpoint of from my interviews
> and other reports that I read, that they were not going to
> open this pit and start selling gravel in 2005, that it
> would be delayed. You know, I reported information on, you
> know, two, six, and ten years. There was no specific reason
> for that, and I could have done 15 and 25 years and just
> from my understanding of the discounted cash flow, that the
> value would have still exceeded the value that was placed on

property as far as the conservation easement as I understand it today.

Mr. Emmerling concluded the following values in his "what-if" scenarios:

| Property | 2008 | 2008 (5-percent growth rate) | 2010 | 2010 (2.5-percent growth rate) | 2014 |
|---|---|---|---|---|---|
| Esgar | $535,806 | $547,600 | $456,134 | $481,393 | $332,962 |
| Holmes | 747,771 | 772,694 | 633,165 | 674,184 | 458,656 |
| Tempel | 783,071 | 806,646 | 663,870 | 707,144 | 479,435 |
| Assembled | 1,427,909 | 1,554,540 | 1,217,589 | 1,367,641 | 892,441 |

Mr. Emmerling did not analyze supply or opine as to when demand would mature although he did state realization of income from sand and gravel production as a revenue source "will not be experienced in the near-term".

2. Evidentiary Objection

An expert's opinions are admissible if they assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; ASAT, Inc. v. Commissioner, 108 T.C. 147, 168 (1997). Whether Mr. Emmerling's report and testimony will be received in evidence and considered in determining the FMV of the easements depends on the application of principles expressed in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993), as related to rules 702 and 703 of the Federal Rules of Evidence.

Rule 702 of the Federal Rules of Evidence provides that a qualified expert may testify:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999), the Supreme Court applied the same standard to expert testimony that was not "scientific". The Supreme Court has stressed the trial court's "gatekeeper" function in excluding evidence that is not reliable. Daubert v. Merrell Dow Pharms., Inc., supra at 597. "The trial court retains broad discretion in assessing an expert's reliability and making its ultimate determination of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 779 (10th Cir. 2009).

Although special considerations apply to jury trials, the Daubert analysis is not limited to jury trials. See id. ("while Daubert's standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a * * * court is conducting a bench trial); see also Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

Respondent argues that Mr. Emmerling's report was "Essentially * * * based on the opinions and analysis of Cruikshank, Frahme, and Ebanks, not on independent data and information". Respondent asserts Mr. Emmerling "performed no independent analysis" and that his "reports are not based on a reliable foundation."

Petitioners argue that "Mr. Emmerling used a generally accepted methodology, and applied it in a very straightforward manner. His testimony and report will assist the Court in determining the value of the Petitioners' charitable contribution deduction." We agree with petitioners and will admit Mr. Emmerling's report. See Kumho Tire Co. v. Carmichael, supra at 152 (a "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). We will accord it, however, only as much credence, if any, as we conclude it deserves after our analysis of the entire case record.

E.   Respondent's Expert--Kevin McCarty

Mr. McCarty is a real estate appraiser who has appraised approximately 50 gravel properties and 150 conservation easements. He is designated a Certified General Appraiser in Colorado and in Wyoming.

Mr. McCarty determined that the before highest and best use of the Subject Properties was agriculture. He determined mining

was not the most productive use because there was an adequate supply of and no additional demand for gravel in Prowers County in the foreseeable future. He concluded: "The dominance by the two major gravel operators leaves little room available either for expansion by these operators or the entrance of a new operator". He estimated that the Midwestern Farms Pit itself had 35 years worth of gravel remaining and the other three large pits had between 25 and 75 years worth of gravel remaining.

Mr. McCarty relied on a sales comparison analysis to determine the before value of the Subject Properties.[18] Mr. McCarty analyzed 22 sales, all within the Arkansas River bottomland, with sale prices for the land itself (excluding improvements and water rights) ranging between $155 and $1,813 per acre. He adjusted the price of each sale to account for differences in location, size, access, quality of underlying gravel resources, and timing, and then classified each sale as a good, fair, poor, or weak comparison to the Subject Properties.

---

[18]Mr. McCarty analyzed the Holmes property differently from the Esgar and Tempel Properties. He calculated the value of the Holmes property using the contiguous parcel rule because the Holmes property was adjacent to the Midwestern Farms property and in the mineral rights in the Jensen property. See sec. 1.170A-14(h)(3)(i), Income Tax Regs. However, he found that the value of the Holmeses' interest in the Midwestern Farms property and in the mineral rights in the Jensen property did not change as a result of the donation of the Holmes conservation easement and therefore this had no effect on value. Mr. McCarty also differentiated the Holmes property from the Esgar and Tempel Properties on the grounds that it had legal access and was next to an operating gravel pit, the Midwestern Farms Gravel Pit.

Mr. McCarty determined 3 of the 22 sales--sales 4, 11, and 17--offered "Good" comparisons to the Holmes property.[19] Using these comparisons, Mr. McCarty determined that a reasonable land value was $400 per acre (54.35 x 400 = $21,740, which Mr. McCarty rounded up to $22,000 total).[20] He then determined the BMIC water shares were worth $1,200 per share (11.66 x $1,200 = $13,992, which Mr. McCarty rounded up to $14,000 total). In total, Mr. McCarty determined the before value of the Holmes property was $36,000.

Mr. McCarty determined 8 of the 22 sales--sales 3, 5, 6, 7, 8, 11, 13, and 16--offered a "Fair" comparison to the Esgar and Tempel Properties. These eight sales were of properties adjacent to the Arkansas River that were close to the Esgar and Tempel Properties; six occurred within 2 years of the valuation date, and many had mineral reserves underlying the properties. After adjusting for water rights, the sale prices of the underlying land of the eight properties ranged from $160 per acre to $473 per acre. Using these comparisons, Mr. McCarty determined that a reasonable land value was $350 per acre (54.34 x 350 = $19,019, which Mr. McCarty rounded down to $19,000 total). As with the

---

[19]Sale 4--2,692 acres were sold for $430,700 or $160 per acre. No water rights or improvements were involved. See infra pt. V.C.1. for a description of sales 11 and 17.

[20]We note that on page 117 of Mr. McCarty's report for the Holmes property he mistakenly states a value of $350 per acre for the Holmes property.

Holmes property before value, he determined that the BMIC water shares were worth $14,000.  In total, Mr. McCarty determined the before value of the Esgar and Tempel Properties was $33,000.

IV.  Subsidiary Issues

Before addressing the parties' arguments as to the before highest and best use and FMV of the Subject Properties, we shall address three subsidiary issues.

A.  Contiguous Parcel Rule

Respondent used the contiguous parcel rule of section 1.170A-14(h)(3)(i), Income Tax Regs., to value the Holmes conservation easement.  See supra note 18.  Respondent urges that use of the contiguous parcel rule was appropriate; petitioners assert it was not.  Section 1.170A-14(h)(3)(i), Income Tax Regs., provides in part:

> The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family as defined in section 267(c)(4) is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction.  If the granting of a perpetual conservation restriction after January 14, 1986, has the effect of increasing the value of any other property owned by the donor or a related person, the amount of the deduction for the conservation contribution shall be reduced by the amount of the increase in the value of the other property, whether or not such property is contiguous. * * * For purposes of this paragraph (h)(3)(i), related person shall have the same meaning as in either section 267(b) or section 707(b). * * *

Respondent views the Holmeses' interest in the Midwestern Farms property and in the mineral rights of the Jensen property

as being contiguous to the Holmes property, which is across a county road. Petitioners contend (1) the county road breaks the continuity; (2) because the Holmeses owned only a 25-percent interest in the Midwestern Farms property and in the mineral rights of the Jensen property, there was no familial cross-ownership; and (3) the contiguous parcel regulation is invalid.

We do not decide whether respondent's use of the contiguous parcel rule was appropriate or whether the regulation proffering the rule is invalid because we agree with respondent that the issue is moot.[21] Mr. McCarty determined that the Holmeses' interest in the Midwestern Farms property and in the mineral rights of the Jensen property did not change because of the donation of the Holmes conservation easement. Therefore, use of the contiguous parcel rule did not affect respondent's value of the Holmeses' charitable contribution deduction in any way.

---

[21]In his report, Mr. McCarty, using the contiguous parcel rule, concluded the before value of the 1,281 acres he treated for this purpose as the Holmes property was $460,000 and the after value of the same property, which included the 54.35 acres subject to the conservation easement, was $451,000. Respondent has since conceded the after value of the Holmes property was $27,000. We note respondent's concession to a $27,000 after value and his argument that the use of the contiguous parcel was correct are seemingly in conflict with each other. We also note that since the trial and filing of the briefs in this case, Natl. Muffler Dealers Association, Inc. v. United States, 440 U.S. 472 (1979), on which petitioners in part rely, has been supplanted by Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. __, 138 S. Ct. 704 (2011), which grants substantial deference to the regulation in this context.

B.  Access Easement

The Federal Land Bank of Wichita (FLBW) obtained a Deed of Trust on the Subject Properties from the prior owners, Gene and Darla Hammit (the Hammits) on December 4, 1978.  The Hammits granted an access easement over the Subject Properties to Holly Flood Control, Drainage and Sanitation District on November 30, 1979.  The Hammits' Deed of Trust was foreclosed by FLBW, which obtained title via a Public Trustee's Deed on June 14, 1985. FLBW sold the property to petitioners on February 20, 1987.

According to petitioners, Mr. McCarty placed "great weight (and assigned significant negative value)" to the potential access easement.  They assert that under Colorado law, the access easement was voided as a junior lien in the foreclosure and that Mr. McCarty "blindly and unprofessionally based his conclusion of value on an incorrect assumption".  Respondent counters that while Mr. McCarty considered the access easement as a potential limit on the use of the properties for gravel mining, he "did not determine * * * [the issue alone] was sufficient to preclude or establish that the highest and best use * * * was gravel mining".

Colorado law provides that

a purchaser of property at a foreclosure sale obtains a deed to the property after the redemption period expires and that "upon the issuance and delivery of such deed . . . title shall vest in the grantee and such title shall be free and clear of all liens and encumbrances recorded or filed subsequent to the recording or filing of the lien on which the sale * * * was based."

First Interstate Bank v. Tanktech, Inc., 864 P.2d 116, 119 (Colo. 1993) (quoting Colo. Rev. Stat. sec. 38-39-110 (1982)); see also Colo. Rev. Stat. sec. 38-38-501 (2010). On the basis of this case and the statute, we agree with petitioners that the foreclosure sale extinguished the access easement.

We recognize that there is always a potential for litigation to clear title. However, we do not think that a potential buyer of the Subject Properties would have placed emphasis on this possibility. There is no evidence that the Holly Flood Control, Drainage and Sanitation District ever argued that the easement survived the 1985 foreclosure. As of 2004 it had been approximately 19 years since the foreclosure sale extinguished the access easement. The easement was extinguished by a statute whose "plain intent * * * is to extinguish all subordinate liens upon foreclosure" and has a purpose which "is to allow a transferee to rely on the state of record title." First Interstate Bank v. Tanktech, Inc., supra at 119. Therefore, we conclude that the access easement had no effect on the before value of the Subject Properties.

C. Mineral Rights Reservation

The Corporation Special Warranty Deeds issued to petitioners by FLBW on February 20, 1987, when petitioners purchased the Subject Properties, reserved to the seller "all of the minerals and mineral rights it owned prior to January 23, 1982". On April

14, 1989, the District Court of Prowers County, Colorado, in an amended order granting partial summary judgment in an action to quiet title, held that upon FLBW's foreclosure of the Hammits' deed of trust, any mineral rights held by the Hammits were extinguished.

Petitioners argue that the action to quiet title disposed of any rights the Hammits might have had to sand and gravel on the Subject Properties. They argue that as for FLBW's potential interest, Colorado law states that "gravel and sand are not normally treated as minerals within the meaning of a general reservation of minerals clause." Kinney v. Keith, 128 P.3d 297, 306 (Colo. App. 2005). Respondent, as he did with the access easement, argues that while he considered the potential mineral rights reservation, he did not think it was "sufficient to preclude or establish that the highest and best use" was gravel mining.

We agree with petitioners that the 1989 order issued by the District Court of Prowers County foreclosed any rights the Hammits' might have retained in minerals on the Subject Properties. As for FLBW, the Corporation Special Warranty Deeds were issued to petitioners in 1987, and FLBW has never asserted any rights in minerals on the Subject Properties. We also agree that "sand and gravel" are not normally considered minerals. See id. As with the access easement, we recognize there is always a

potential for litigation.  And while there is no evidence of any minerals beneath the Subject Properties, a buyer would prefer property without any reservations.  But taking all of this into consideration, we still conclude that the mineral rights reservation had no or only an irrelevant, infinitely small effect on the before value of the Subject Properties.

V.    Analysis

Petitioners argue the before highest and best use of the Subject Properties was gravel mining.  They urge this Court to sustain the charitable contributions reported on their respective 2004 tax returns and if we do not sustain those claims, to accept Mr. Emmerling's 4-year deferral scenario values of $511,806, $720,711, and $759,071 for the Esgar property, the Holmes property, and the Tempel property respectively.[22]  Respondent argues the before highest and best use of the Subject Properties was agriculture and that, after subtracting the stipulated after values, all three conservation easements are worth $9,000.

We agree with respondent that the before highest and best use was agricultural.  We agree with respondent that the water rights were worth $1,200 per share or $14,000 total for each

_____

[22]Petitioners urge this Court to accept Mr. Emmerling's values without addressing the fact that Mr. Emmerling specifically stated he did not make any conclusions as to value.
These values take into account the stipulated after values of $24,000 for the Esgar and Tempel properties and $27,000 for the Holmes property.

property before the conservation easements were granted.[23]  We

find the Esgar and Tempel Properties were worth $1,100 per acre

(or $59,774) and the Holmes property was worth $1,150 per acre

(or $62,502.50) before the conservation easements were granted.

In total, the before value of the Tempel and Esgar properties was

$73,774 and the before value of the Holmes property was

$76,502.50.  After subtracting the stipulated after FMVs, the

Tempel and Esgar conservation easements were worth $49,774 and

the Holmes conservation easement was worth $49,502.50.

A.  Gravel Mining Was Not the Before Highest and Best Use

In deciding whether gravel mining was the before highest and

best use, the main question we are faced with is whether it was

reasonable to conclude that a hypothetical willing buyer in 2004

would have considered the Subject Properties as the site for

construction of a gravel mine.  The evidence shows they would

not.  See Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 339

(2011) (finding taxpayer's asserted highest and best use was

"certainly inconsistent with the * * * evidence in this case").

Petitioners' argument that gravel mining was the before highest

and best use is, inter alia, conditioned on (1) assemblage of the

three Subject Properties and (2) deferral in production.  We

address each separately.

---

[23]Petitioners provided and we are aware of no reason to
question Mr. McCarty's valuation of the water rights at $1,200
per share.

### 1. Assemblage

Petitioners argue they

> have been in business together for decades * * * [and] have long owned land together and were the first operators of the Midwestern Farms Gravel Pit * * *. Respondent failed to acknowledge the ease with which the Petitioners could assemble their three parcels and begin gravel mining, had they chosen to do so.

Respondent argues no evidence was presented showing assemblage was "reasonably practicable in the foreseeable future". He further argues the evidence presented contradicts assemblage's being a reasonable possibility.

We agree with petitioners although we question whether a willing buyer would have thought assemblage to be that "easy", considering the three Subject Properties had once been jointly owned and were partitioned before the conservation easements were donated. While we expect the separation of the properties was for purposes of claiming Federal charitable contribution deductions and/or State tax credits, petitioners, who knew exactly why the properties were separated, never explained to the Court their reasons. Regardless, we do not decide whether assemblage was reasonable because petitioners' argument fails as to their second required condition, deferral in production.

### 2. Deferral in Production

Petitioners and their experts Mr. Frahme and Mr. Emmerling acknowledge gravel could not have feasibly been extracted from the Subject Properties in 2004. Mr. Frahme stated: "Because

gravel markets are generally in equilibrium, not demanding additional material, as of * * * [December 2004], considerable time may be required for the ultimate highest and best use of mining to be effective." But how long is a "considerable time"? While petitioners did "not have to show an imminent demand for the [aggregate] from [their] property", they did have "to show that * * * [it would] be needed and wanted at a near enough point in the future to affect the current value of the property." United States v. 69.1 Acres of Land, 942 F.2d at 294. In the absence of a market's being established, any projection of income becomes little more than speculation and conjecture. Cloverport Sand & Gravel Co., Inc. v. United States, 6 Cl. Ct. 178, 198-199 (1984) (concluding that the existence of a market that would justify extraction in the reasonably foreseeable future must be shown). Petitioners assert that "it was reasonable to conclude that as of 2004, the market for aggregate in Prowers County was poised to explode".

According to Mr. Frahme and Mr. Emmerling, demand will increase and mining will begin when (1) demand in the Front Range increases and (2) gravel can be backhauled from Prowers County to

the Front Range.[24]  The evidence does not establish that this was

a possibility in the reasonably foreseeable future.

### a.  Increased Demand in the Front Range

There is sufficient evidence that as of 2004, demand in the

Front Range was increasing because of the difficulty in

permitting there.  Yet there is a difference in an increased

demand in the Front Range and an increased demand for aggregate

from Prowers County in the Front Range.  Petitioners never

address this.  Rather, they assume all that must be shown is a

way for gravel to be transported from Prowers County to the Front

Range.  They do not consider gravel mines closer to the Front

---

[24]Even though petitioners appear to abandon Mr. Ebanks'
opinion, we briefly address it.  Mr. Ebanks fails to recognize
that the establishment of a market is necessary, stating that
gravel resources have intrinsic value and one need only multiply
the quantity by the current market price to determine FMV.  Mr.
Ebanks was wrong.  "[L]and having a sand or gravel content may
not be valued on the basis of conjectural future demand for it.
There must be some objective support for the future demand,
including volume and duration."  United States v. Whitehurst, 337
F.2d 765, 771-772 (4th Cir. 1964); see also United States v. 69.1
Acres of Land, 942 F.2d 290, 294 (4th Cir. 1991) (stating that
the taxpayer "has to show that there is a reasonable probability
that the sand will be needed and wanted at a near enough point in
the future to affect the current value of property").
    Mr. Ebanks assumed production could start immediately after
a 5-month permitting process and that each of the Subject
Properties would produce 10,000 tons per month during a 2-month
startup phase and 41,000 tons per month (or 492,000 tons per
year) once full production was reached in June 2005.  Not only
did Mr. Ebanks never address a market; he never explained how the
Subject Properties could produce and sell 1,011,000 tons of
gravel in 2005 and 1,476,000 tons of gravel in 2006 when all
Prowers County gravel pits together produced only 1,450,000 tons
of gravel in 2005.

Range or contradict the statement of respondent's rebuttal

expert, Paul T. Banks, Jr.:

> even if such rail haul is viable at some point in the
> future there are several large, permitted sand and
> gravel mines, with very high volumes of remaining
> reserves, located adjacent to [the same rail line going
> through Prowers County], in Pueblo County, perhaps 70
> or 80 miles closer to the Front Range.  If rail haul to
> the Front Range becomes viable, there are large
> permitted sites in Cheyenne, Wyoming and near Canon
> City, Colorado that have existing rail infrastructure
> to transport sand and gravel products.

In his report, Mr. Frahme acknowledged that the closer to

the Front Range, the better the quality of aggregate reserves.

His argument for an increased demand in Prowers County relied on

the difficulty in permitting in the Front Range and the fact that

Prowers County reserves were better than those even further away.

While we do not necessarily disagree with Mr. Frahme's

statements, we question why he did not address reserves adjacent

to the BNSF rail line closer to the Front Range than Prowers

County.  In conclusion, the record contains no evidence that

mines closer to the Front Range than those in Prowers County were

not satisfying and could not continue to satisfy the increasing

Front Range demand.

A related problem with an increased demand for Prowers

County aggregate in the Front Range is that even if demand in

Prowers County did increase, there is no evidence that the

existing Prowers County mines could not handle the increased

demand.  Mr. McCarty estimated that 39,060,000 tons of aggregate

remained in the four pits, with 23,660,000 tons in the Midwestern Farms Pit itself.[25]  Petitioners disagree with Mr. McCarty, stating respondent speculates "as to the amount of gravel existing in Prowers County.  Respondent's data does not address the market".

Neither petitioners nor their experts provided us with an estimate of remaining aggregate.  Petitioners own the land on which the Midwestern Farms Pit is situated and chose not to provide information on the amount of aggregate remaining.  Their failure to introduce evidence "which, if true, would be favorable to * * * [them], gives rise to the presumption that if produced it would be unfavorable."  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Additionally, petitioners' experts Mr. Ebanks (and Mr. Emmerling) calculated that there was approximately 7.6 million

---

[25]The Midwestern Farms Gravel Pit had average production from 2001-04 of 676,000 tons per year.  Mr. McCarty estimated that on the basis of this production, the Midwestern Farms Gravel Pit had a life of 35 years; 676,000 x 35 = 23,660,000.  The S-C Pit produced on average 203,000 tons per year from 2001-04; and on the basis of this, Mr. McCarty estimated it had a life of 50 years (for an estimated total production of 10,150,000 tons).  The J-S Farms Pit produced on average 63,000 tons per year from 2001-04; and on the basis of this, Mr. McCarty estimated it had a life of 25 years (for an estimated total production of 1,575,000 tons).  The Hardscrabble Pit produced on average 49,000 tons per year from 2001-04; and on the basis of this, Mr. McCarty estimated it had a life of 75 years (for an estimated total production of 3,675,000 tons); 23,660,000 + 10,150,000 + 1,575,000 + 3,675,000 = 39,060,000.

tons of mineable aggregate on the Subject Properties, a number which is not in dispute.[26]  If there was over 7 million tons of estimated aggregate beneath approximately 160 acres, we find it incredible that petitioners are disputing the statement that over 24 million tons lie beneath more than 1,400 acres.  The Midwestern Farms Pit has been in operation since the 1990s, and in its busiest year only 1 million tons of aggregate was mined.  Other than petitioners' unsupported statements, the record contains no evidence that this pit alone, the largest in Prowers County, does not have enough supply to satisfy an increased demand.

b.  Backhauling Gravel From Prowers County

Petitioners argue coal trains traveling to Prowers County on the BNSF railroad could backhaul gravel to the Front Range on their return trips.  We address three problems with this logic.

(1)  Unloading Facility

An unloading facility in the Front Range is necessary. Michael Ray, BNSF Railroad's manager of economic development for Colorado and Wyoming, testified there was no facility in the Front Range capable of unloading aggregate, although Front Range Aggregates has land where they have proposed building an

---

[26]Mr. Frahme acknowledged that "A supply analysis must be conducted in order to accurately assess the level of competition expected as an aggregate producer new to the market area. * * * There were four quarries that would have been able to serve the Holly market area competitively".  Yet he still did not analyze supply.

unloading facility.[27]  While Mr. Banks stated there were unloading facilities immediately north of Denver in Commerce City and perhaps a still active facility east of Denver in Aurora, there is no evidence on which rail line these unloading facilities were situated or whether these facilities still existed in 2004.

### (2)  Willing Coal Company

Backhauling gravel requires a willing coal company. Petitioners rely on coal trains going to (1) the Lamar Power Plant and (2) the Tri-State Generation Plant.  Mr. Ray testified that coal trains carrying coal to the Lamar Power Plant and returning through Denver empty provided an opportunity for backhauling.  However, the Lamar Power Plant did not begin burning coal until 2007 or 2008.  According to unsupported testimony at trial, Tri-State Generation (Tri-State) began exploring the construction of an electric power generation plant in the Lower Arkansas Valley in 2001 and authorized the acquisition of land in 2005.  However, whether Tri-State's proposed plant would be run on nuclear, coal, or natural gas had not been determined even as recently as 2009, when this case was tried.

---

[27]If the unloading facility is built, Front Range Aggregates will bear the construction costs.  Petitioners fail to address how this would affect royalty prices.

### (3) Trains

There are differences between gravel and coal trains. Mr. Ray credibly explained that gravel is normally shipped on 90-car steel open-top gondola trains, while coal is typically shipped on 120-car aluminum open-top hopper trains. Gravel and coal should not be commingled; thus the rail cars need to be cleaned between each load. The record contains no evidence as to the time and cost of this cleaning process.[28]

### (4) Conclusion and Testimony

Testimony at trial establishes that backhauling gravel from Prowers County to the Front Range was not a reasonably foreseeable possibility in 2004. Ira Paulin, the former owner of the Carder Company, explained that the Carder Company did not ship its aggregate by rail because it was not feasible.[29]

---

[28]An additional problem is that coal trains typically average 6 days per round trip or 60 cycles per year. Backhauling gravel adds approximately 3 days to the trip, allowing the train to make only 40 cycles per year.

We acknowledge that the coal train currently bringing coal to the Lamar Power Plant only makes two trips per month. However, this is considered highly unusual, and there is no evidence as to how long this practice will continue. And if backhauling on these trains is feasible, we question why it was not being done as of the time of trial.

[29]Petitioners, citing Mr. Paulin's testimony, argue that "Carder, Inc. did not consider rail-hauling because they sold all rock and gravel they could produce and carried no excess inventory." Petitioners misconstrue Mr. Paulin's testimony. Mr. Paulin testified that during his time at Carder Company, approximately half of what was produced was backhauled on semi-tractor trucks that had brought corn into the Lower Arkansas Valley from Nebraska. He did testify that "there were times that

(continued...)

Petitioners ignore the Carder Company and rely on the fact that the Midwestern Farms Pit had shipped gravel before. This Court wonders why the Midwestern Farms Pit had ceased shipping gravel at the time the easements were donated. Petitioners, as part-owners of the Midwestern Farms Pit, could have provided the evidence to answer this question, yet did not do so.

B. Conclusion on Highest and Best Use

The before highest and best use of the Subject Properties was agriculture. The evidence does not support petitioners' argument that it was aggregate mining. While it would have been physically possible to mine the properties in 2004 (or in the future), there was no unfilled demand and there was no unmet market. The record contains no evidence to support petitioners' assertion that this was to change in the reasonably foreseeable future. Olson v. United States, 292 U.S. at 257; United States v. Whitehurst, 337 F.2d at 771-772. Having established the before highest and best use, we turn to the before value.

---

[29](...continued)
* * * [Carder Company] could have sold more if we could have produced more", yet when asked when this occurred he stated: "when the road building was really going good, well, it was probably a good number of the years in the '80s and early '90s." While the current owner of the Carder Company, Ron Peterson, also testified there were times when the Carder Company carried little inventory, we give his testimony less weight because it is self-serving as he has placed conservation easements on land he owned and can potentially benefit from a high valuation in this case. Additionally, Mr. Paulin testified that landowners were willing to lease their land to Carder Company, indicating that if Carder Company wanted to extract more gravel, they could have done so.

C.  Before Value

The comparable sales approach is generally the most reliable indicator of value when there is sufficient information about sales of properties similar to the subject property.  See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987); Estate of Rabe v. Commissioner, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977).  The comparable sales approach is based on the principle that the prudent purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility.  Hughes v. Commissioner, T.C. Memo. 2009-94.  "Real property may be unique and the comparable sales too few to establish a conclusive market price, 'but that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property.'"  United States v. Whitehurst, supra at 775 (quoting United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 401 (1949)).  Comparable sales require this Court to determine whether the properties were sufficiently comparable to the property being valued and whether the buyer and seller were both informed regarding all of the factors relevant to the land's value.  Terrene Invs., Ltd. v. Commissioner, T.C. Memo. 2007-218.

Petitioners argue there were no comparable sales. We disagree.[30] Mr. Cruikshank was the only one of petitioners' experts who looked at potential comparable sales, opining that as of 2004 "in dealing with farmland buyers and investors, gravel has not been a primary consideration and only seems to be an afterthought if considered at all". Mr. Cruikshank's testimony and report reinforces our conclusion that no separate market existed for gravel properties in 2004. Gravel was not a "primary consideration" because there was no separate market.

### 1. Two Sales

Two of the sales provided by Mr. McCarty--sale 11 (GP Ranches property) and 13 (City Farm property), were instrumental both in our conclusion as to the before value and our conclusion supra part V.A. that gravel mining was not the highest and best use.

---

[30]Petitioners argue that DCF analysis is the only proper method to use in valuing gravel properties, citing Cloverport Sand & Gravel Co. v. United States, 6 Cl. Ct. 178 (1984), and Terrene Invs., Ltd. v. Commissioner, T.C. Memo. 2007-218, as their support. In Cloverport Sand & Gravel Co. v. United States, supra at 194, the Claims Court stated: "Because the plaintiff's property is an income producing property capable of producing a stream of income derived from what both parties concede is the property's highest and best use, the income capitalization approach is a preferable valuation method." Mr. Ebanks was an expert in Terrene, where DCF analysis was also used. Petitioners state "Ebanks report in this matter cases follows the methodology accepted and utilized in the Terrene case, subject to minor adjustments as recommended by the Court in the Terrene memorandum opinion". Petitioners fail to recognize that in both Cloverport Sand & Gravel Co. and Terrene, highest and best use had already been established and the DCF analysis reflected that use.

### a.  Sale 11--GP Ranches Property

The 2,398 acre GP Ranches property was bought by GP Ranches, LLC (GP Ranches), in July 2004 along with 3,108 shares of Lamar Canal water rights for $2,008,000.[31]  After subtracting the value of the water rights, $411 per acre was attributable to the land and underlying gravel.

This property borders the Arkansas River, Highway 50, and the BNSF railroad.  Importantly, the GP Ranches property was core

---

[31]At trial Mr. Nyquist, one of the owners of GP Ranches, testified that the GP Ranches property was sold for $2,050,000.

A memorandum was prepared by one of the partners in GP Ranches before the GP Ranches property was purchased.  The memorandum opens with the statement that the property has "several potential profit centers including traditional agricultural, recreational hunting, water rights, real estate development and conservation easements all in one property".  The memorandum goes on to state:

> We anticipate that easements will generate cash flow through out holding period * * *.  There has been a recent flurry of conservation easements in this area that have been placed on properties protecting them from gravel mining.  The appraisals that have been done placed the value of the gravel between $14,000 and $18,000 per acre * * *.  Using the lower end of the established appraised range per acre at $14,000 and subtracting out the residual land value of $1,000 per acre yields a net $13,000 per acre value that can be placed on a conservation easements.

The memorandum lays out the value of the State tax credits and Federal charitable contribution deductions available to those who donate conservation easements.  This memorandum convinces us that purchasers of property in 2004 did not anticipate a heightened demand for gravel anytime in the near future even though properties such as the GP Ranches property were "known for * * * [their] gravel reserves", but rather placed value on other attributes such as water rights associated with properties or the ability to place conservation easements on property.

sampled before it was bought with significant gravel resources found beneath the property. A portion of the property was permitted for mining in 2009. We find this property comparable to the Subject Properties, with the major difference being the size. The Subject Properties were a combined 163 acres whereas the GP Ranches property was 2,398 acres.

Petitioners ignore the 2004 sale of the GP Ranches property. Instead they place value on (1) Mr. Peterson's, the current owner of the Carder Company, testimony that in 2008, he offered to mine the GP Ranches property and (2) Karl Nyquist's, one of GP Ranches' owners, testimony that as of the date of trial, a portion of GP Ranches was under a contract to sell for $10,000 per acre, 40 percent being attributable to gravel and 60 percent to water storage. Mr. Nyquist further testified, as of trial, GP Ranches was in final negotiations with Front Range Aggregates regarding mining the permitted portion. Mining would begin sometime in 2010 and once mining began, the gravel would be transported away from Prowers County via rail. None of the above-mentioned contracts were provided to this Court. Even if they are as advertised, we are valuing the Subject Properties as of 2004--and as of 2004, a future demand for gravel was <u>not</u> affecting market prices.

### b. <u>Sale 13--City Farm Property</u>

The 1,875 acre City Farm property was bought by Mr. Peterson in December 2004 along with 666 shares of water rights for

$776,000.  After subtracting the value of the water rights, $160 per acre was attributable to the land and underlying gravel reserves.  The City Farm property is adjacent to a railroad, the Arkansas River, and the Hardscrabble Pit.  Mr. Peterson testified he bought the property for agricultural use and did not core sample the property before purchase.  Portions of this property have since been placed in conservation easements.

Like the GP Ranches property, we find this sale comparable, with the main difference being the size.  We acknowledge that the seller, the City of Lamar, and the buyer, Mr. Peterson, may not have had actual knowledge of the quantity and quality of gravel underneath this property.  While petitioners emphasize that none of Mr. McCarty's comparisons are truly comparable because none were between "knowledgeable parties", we find this disingenuous.  Mr. Peterson is a gravel pit operator, and governmental entities generally operate gravel pits.  Further, "parties to such transactions are presumed to have taken into consideration all the elements of value to be attributed to the land."  United States v. 494.10 Acres of Land, 592 F.2d at 1132.  But see Terrene Invs., Ltd. v. Commissioner, supra (ignoring two sales because the property was sold before either party knew there was sand and gravel beneath the property).[32]

---

[32]We also looked at sale 17, where the 3,360 acre Butte Creek property was purchased as part of a distressed sale in July 2006 along with 1,440 shares of water rights for $1,925,000.  The
(continued...)

## 2. Large Acreage

Petitioners do not address how the amount of acreage affects property values, but Mr. McCarty states: "Per-acre values tend to decrease with increasing size." See also Akers v. Commissioner, 799 F.2d 243, 246 (6th Cir. 1986) (agreeing with this Court that the closer in size a property is, the more comparable it is), affg. T.C. Memo. 1984-490; Estate of Kolczynski v. Commissioner, T.C. Memo. 2005-217 (noting premium paid for smaller parcels); Pope & Talbot, Inc. & Subs. v. Commissioner, T.C. Memo. 1997-116 (concluding the larger the

---

[32](...continued)
Butte Creek property is catty corner across the river from the Midwestern Farms Gravel Pit and was briefly mined in 2007 by the Carder Company. The Butte Creek property was not core sampled before purchase. We find this property comparable, but because it was part of a distressed sale, the sale of the GP Ranches property and City Farm property are more comparable and therefore we rely primarily on those two sales.

The buyer was Butte Creek and River Reserve LP/CO Water & Land, LLC, of which Mr. Peterson was a part owner. Mr. Peterson testified as to the purchase of the Butte Creek property yet never specified the acreage of the property. In Mr. McCarty's comparable sales, the sale price is listed as $1,925,000 and the site size as 3,360 acres. However, in the comments section, he states the "sale was taken in two parcels by the same people", with the north having more gravel potential. The north parcel compromised 1,238 acres and was apparently sold for $1,400,000 ($1,130.86 per acre) and the south parcel compromised 915 acres and sold for $525,000 ($573.77 per acre). The sales price for each individual parcel adds up to $1,925,000 yet the acreage does not. Rather 1,238 + 915 = 2,153 acres. The map included in Mr. McCarty's report indicates about five 640 acre sections are involved, thus we conclude the 3,360 acres figure is probably correct.

parcel the higher the appropriate discount), affd. 162 F.2d 1236 (9th Cir. 1999). Which brings us to sales 10 and 15.

### a. Sale 10

On April 9, 2004, 126.38 acres were sold for $1,084. After subtracting water rights, each acre was valued at $831. The property was next to an operating gravel pit, and while the property was not core sampled before purchase, the buyers obtained data on the adjacent property (City Farm property).

### b. Sale 15

On December 28, 2005, 145.66 acres were sold for $380,100 or $2,610 per acre. After subtracting water rights, each acre was valued at $1,813.[33] A 38-acre portion of the property had been permitted for mining in 1998, and about 10 acres had been mined. The buyers intended to place conservation easements on the property.[34]

### 3. Petitioners' Remaining Arguments

### a. Comparables

Petitioners argue that the purchase by Valco, Inc. (Valco), a ready-mix company, of 4.33 acres in 1994 for approximately

_____

[33]We note that page 96 of Exhibit 89-R, Mr. McCarty's report, shows that sale 15 was for $1,821 per acre. We arrive at $1,813 on the basis of exhibit L attached to Mr. McCarty's report.

[34]By placing the conservation easements on the Subject Properties, petitioners precluded any future purchasers from granting one and obtaining the tax benefits. This must be factored into the determination of the FMV.

$36,000 was "the only truly comparable sale between knowledgeable parties". The president of Valco, Tom Brubaker, testified that Valco bought the property intending to mine it and that the acreage was in the middle of property Valco already owned. At the time of purchase, Valco was mining the adjacent property, and it began mining the purchased property within a few months or a year or two. This sale is of little relevance to the case at hand. It occurred 10 years before the easements were donated, the land was next to an operating gravel pit, mining began shortly after the purchase, and Valco was therefore a logical party to buy property in the middle of land they owned and actively mined.[35]

### b. Leasing Land

Petitioners argue that no comparable sales exist because "gravel operators do not buy gravel land; they lease land and pay royalties to the owner to preserve capital." They argue gravel-producing properties are not typically sold while failing to acknowledge that they sold permitted gravel-producing property (Jensen property) in 1998 for approximately $756 per acre.

---

[35]Petitioners also cite testimony given by William J. Grasmick and Mr. McCarty. Mr. Grasmick testified that as of the date of trial, he had 3,500 acres under a contract of sale to Caddis Capital (Caddis property) for $14,000 per acre. The contract was not introduced at trial, and this Court is unaware whether closing ever occurred. Petitioners rely on Mr. McCarty's testimony that he appraised land north of Denver (Derr property) at $17,000 per acre. The Derr property is not comparable because it has a lease to mine in place and is in a much different area from the Subject Properties (i.e., much closer to Denver).

In his comparable sales, Mr. McCarty included a section entitled "Permitted Gravel Sales".  All the sales contained permitted land, and at least two had leases to mine in place at the time of sale.  The land on which the Hardscrabble Pit is situated was sold in 1998, and mining began 4 months later.  The land on which the S-C Pit is situated was sold in 1998, and at the time of sale, the property was already leased for gravel production.  Finally, in his comparable sales, Mr. McCarty included as sale comparable number 8 the February 2004 sale of land in Hamilton County, Kansas, with a permitted gravel pit with active production at the time of sale.

### 4.  What Was the Before Value

We now address the determinative issue--the before value of the Subject Properties.  We may reach a determination of value based on our own examination of the evidence in the record, giving fair consideration to the opinions of the experts intended to assist us in that regard.  Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.  We will do so here.  We particularly focus on the following sales:  (1) GP Ranches--$411 per acre; (2) City Farm property--$160 per acre; (3) sale 10--$831 per acre; and (4) sale 15--$1,813 per acre.

On the basis of these sales and the voluminous record in this case, we conclude that a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of any relevant facts would have placed a

before value on the Esgar and Tempel Properties of $1,100 per acre and a before value on the Holmes property of $1,150 per acre.  We arrive at numbers, $1,100 and $1,150, on the higher end because of the small acreage of the Subject Properties.  Even as assembled, the Subject Properties are significantly smaller than both the GP Ranches property and the City Farm property.

We value the Holmes property higher because it has legal access whereas the Esgar and Tempel Properties do not. Nevertheless we believe they had access as a practical matter over the Holmes property and could with little cost acquire legal access over the Holmes property.  Taking into consideration the water rights, the before value of the Esgar and Tempel Properties was $73,774 and the before value of the Holmes property was $76,502.50.  After subtracting the stipulated after FMVs, the Tempel and Esgar conservation easements were worth $49,774 and the Holmes conservation easement was worth $49,502.50.

VI.  Section 6662 Accuracy-Related Penalties

Section 6662(a) imposes a 20-percent penalty on "any portion of any underpayment of tax" attributable to the reasons set forth in subsection (b).  Respondent determined the Holmeses and the Tempels are liable under section 6662(b)(2) on account of a substantial understatement of income tax and under section

6662(b)(3) on account of a substantial valuation misstatement.[36]

Only one accuracy-related penalty may be imposed with respect to

any given portion of an underpayment.  Sec. 1.6662-2(c), Income

Tax Regs.

Respondent bears the burden of production with respect to

petitioners' liability for the section 6662(a) penalty.[37]  See

sec. 7491(c).  This means that respondent "must come forward with

sufficient evidence indicating that it is appropriate to impose

the relevant penalty."  Higbee v. Commissioner, 116 T.C. 438, 446

(2001).

There is an exception to the section 6662(a) penalty when a

taxpayer can demonstrate:  (1) Reasonable cause for the

underpayment and (2) that the taxpayer acted in good faith with

respect to the underpayment.  Sec. 6664(c)(1); sec. 1.6664-4(a),

Income Tax Regs.

A.  Substantial Understatement of Income Tax

Respondent argues the Holmeses and the Tempels are liable

for the substantial understatement penalty for their entire

---

[36]The notices of deficiency issued to the Holmeses and the
Tempels indicate that respondent determined a sec. 6662(b)(1)
penalty for negligence or disregard of rules or regulations as
well.  Respondent has since conceded that neither the Holmeses
nor the Tempels are liable for the negligence penalty, leaving
only the penalties for substantial understatement of income tax
and substantial valuation misstatement at issue.

[37]Petitioners raise arguments about respondent's
administrative handling of the sec. 6662(a) penalties.  As we
find neither the Holmeses nor the Tempels are liable for a sec.
6662(a) penalty, we need not address these arguments.

deficiency.  This penalty imposes a 20-percent penalty on any portion of an underpayment shown to be a substantial understatement of income tax.  An understatement is the excess of the amount of tax required to be shown on the return over the amount of tax actually shown on the return less any rebates.  Sec. 6662(d)(2)(A).  A substantial understatement of income tax occurs in any year where, in the case of an individual, the amount of the understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  Respondent has met his burden of production.

The potential understatement will be reduced by the portion attributable to the tax treatment of an item if there was substantial authority for such treatment or if the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in an attached statement and there is a reasonable basis for such treatment.  Sec. 6662(d)(2)(B).  We need not discuss these reductions because, as discussed infra, we find that petitioners have met the reasonable cause and good faith exception and are therefore not liable for the accuracy-related penalty.

B.  Substantial Valuation Misstatement

Respondent asserts that the Holmeses and the Tempels are liable for a substantial valuation misstatement penalty for the portion of the deficiency attributable to their overvaluation of the conservation easements.  Section 6662(b)(3) imposes a 20-

percent penalty on any portion of an underpayment shown to be due to a "substantial valuation misstatement".  This occurs when the value of any property claimed on a tax return is 200 percent or more of the "amount" determined to be correct.[38]  Sec. 6662(e).  Respondent has met his burden of production.

C.  Reasonable Cause Exception

Section 6664(c) provides for an exception to the accuracy-related penalty where a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment.  Sec. 6664(c)(1).  The determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.  Pursuant to section 6664(c)(2), there may be reasonable cause and good faith in the case of any underpayment

> attributable to a substantial or gross valuation over
> statement * * * with respect to charitable deduction
> property * * * [only if]

---

[38]Pursuant to sec. 6662(h), a gross valuation misstatement occurs if the value is 400 percent or more of the amount determined to be the correct valuation, and the penalty increases to 40 percent of the resulting underpayment.
   The Pension Protection Act of 2006, Pub. L. 109-280, sec. 1219, 120 Stat. 1083, modified secs. 6662(c) and 6664(c)(2) with respect to returns filed after Aug. 17, 2006.  It lowered the percentage threshold for substantial valuation misstatements to 150 percent and for gross valuation misstatements to 200 percent.  It also eliminated the reasonable cause exception for gross valuation misstatements.

(A) the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and

(B) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property.

Petitioners argue they made a good faith investigation by relying on their adviser and his accounting firm, by obtaining a core sampling report of the underlying valuable gravel reserves, and by obtaining a qualified appraisal from a qualified appraiser (a fact that respondent does not dispute). They assert that they first requested assistance more than a year before the easements were donated, that Mr. Wurst and Kennedy & Coe did extensive research and analysis, and that an outside law firm had been hired to ensure that any donation met the requirements of substantiation and administration.

> [F]or a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. * * *

Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).[39] On the basis of the

---

[39]Additionally, "The advice must be from competent and independent parties, not from the promoters of the investment" or advisers who have a conflict of interest. Swanson v. Commissioner, T.C. Memo. 2009-31 (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992)); see also Canal Corp. v. Commissioner,

(continued...)

evidence in this case, we conclude that petitioners met all three prongs of this test. Mr. Wurst was a competent professional whom petitioners had worked with for over 25 years, petitioners provided him with all relevant information, and petitioners relied on Mr. Wurst's advice in good faith. Petitioners have established they met the reasonable cause exception to the accuracy-related penalty.

The Court has considered all of petitioners' and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[39](...continued)
135 T.C. 199, 218 (2010) ("Courts have repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest."). On the basis of the evidence in this case, we conclude that Mr. Wurst was neither a promoter nor did he have a conflict of interest. While Mr. Milenski's appraisal license was later suspended by the State of Colorado, he was a qualified appraiser at the time he opined on the value of the conservation easements at issue.