T.C. Memo. 2013-97

UNITED STATES TAX COURT

ARIES COMMUNICATIONS INC. & SUBS., Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27483-10.                     Filed April 10, 2013.

R determined that the compensation P paid to E, its employee
and owner, was unreasonable and disallowed its deduction for the tax
year ending Aug. 31, 2004.

Held: E's compensation was reasonable and deductible under
I.R.C. sec. 162 to the extent determined herein.

Held, further, P is liable for a portion of the I.R.C. sec. 6662(a)
accuracy-related penalty as redetermined in this opinion.

<u>Vicken Abajian</u>, for petitioner.

<u>Aaron T. Vaughan</u>, for respondent.

**[\*2]**         MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  This case is before the Court on a petition for redetermination of a deficiency in income tax and a penalty respondent determined for petitioner's tax year ended (TYE) August 31, 2004.[1]

After concessions the issues remaining are:[2]

(1) whether the compensation paid to N. Arthur Astor was reasonable under section 162 for TYE August 31, 2004; and

(2) whether petitioner is liable for a section 6662(a) accuracy-related penalty for TYE August 31, 2004.

------

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the taxable year at issue.  All references to a tax year are to the fiscal year ended on August 31 of that year, unless otherwise stated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The parties agree that the period of limitations on assessment was properly extended and has not expired for TYE August 31, 2004.  Petitioner concedes that it is not entitled to deduct $550,000 of rental expenses for the year at issue.  Petitioner concedes that it failed to report $93,671 of imputed interest under sec. 7872, and respondent concedes the remainder, $1,298,457, of the imputed interest set forth in the notice of deficiency.  Respondent concedes that the sec. 6662(a) accuracy-related penalty does not apply to the underpayment of tax caused by petitioner's failure to recognize imputed interest under sec. 7872.  Respondent concedes that petitioner generated a net operating loss (NOL) of $2,677,686 during its 2005 tax year and that, subject to computational adjustments, petitioner is entitled to carry back this NOL and claim it as a deduction for the year at issue.

[*3]                            FINDINGS OF FACT

The parties' stipulation of facts, with accompanying exhibits, and the stipulation of settled issues are incorporated herein by this reference.[3]  At the time petitioner filed the petition, its principal place of business was in California.

N. Arthur Astor

N. Arthur Astor has been in radio broadcasting for over 60 years.  He was involved in several television shows, did a little film work, and worked as a talent in radio broadcasting before he decided to become involved in broadcasting sales.  After many years of managing sales for a multitude of different radio broadcasting companies, Mr. Astor in June 1970 was employed as general manager of KADY, a 50,000-watt radio station in Los Angeles owned by Atlanta-based Rollins Broadcasting.  In 1975 he was employed by Dratch & Knott Enterprises, which owned three radio stations and was the number one programing company supplying programing and special features to radio stations nationally.

---

[3]Petitioner objects to stipulated paras. 6, 21, 22, 24, 57, and 61-67 and Exhibits 4-J, 5-J, 18-J, 19-J, and 22-J through 37-J on the grounds of relevance. Fed. R. Evid. 401 states:  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  We  overrule petitioner's objections and hold that the exhibits tend to make the reasonableness of Mr. Astor's compensation more or less probable.

**[*4]** About two years later Mr. Astor was offered a position as general manager of a small FM radio station in Canoga Park, California, with ownership potential based on performance levels. He met those performance requirements and after two years of work earned 10% of the station and was then able to purchase another 10% of that station for 10%, $31,200, of its original 1976 $312,000 purchase price. In 1983 Mr. Astor arranged for a loan and bought out his other partners to became the sole owner of that station, KIKF.

At the same time that Mr. Astor bought out his KIKF partners, he or an entity he controlled also purchased two other radio stations, KTIM-AM and FM, in Marin County, California. He then purchased two more stations, KOWN-AM and FM, in San Diego, California, in 1987. He sold the two Marin County stations in 1994, and he purchased an additional North San Diego station, KCEO, in 1995. In 1999 or 2000 Mr. Astor purchased another station, KSPA AM 1510, in Ontario, California, from a friend.

Mr. Astor bought and sold certain of these stations using petitioner, Aries Communications Inc. (Aries), and its subsidiaries Orange Broadcasting Corp. and North County Broadcasting Corp. (Orange Broadcasting and North County

[*5] Broadcasting, respectively).[4] Mr. Astor was Aries' president, chief financial officer (CFO), and sole shareholder from its incorporation in 1983. Mr. Astor acted as general manager of each of petitioner's radio stations. He was a "hands-on" manager who was actively involved in many aspects of petitioner's day-to-day operations. Mr. Astor's duties included: (1) oversight of petitioner's other management personnel; (2) planning and overseeing the execution of programming; (3) negotiating and communicating with petitioner's lenders; (4) participating in sales meetings; and (5) communicating with outside advisers (such as lawyers and accountants).

Susan E. Burke

Susan Burke has served as the executive vice president and corporate secretary for both Orange Broadcasting and North County Broadcasting from 1996. Her duties included: (1) Federal Communications Commission (FCC) issues (e.g., license renewals and upgrades, consultation with counsel); (2) labor and employment issues; (3) music licensing; and (4) review of documents, leases, and contracts. During the year at issue petitioner paid Ms. Burke $288,654, including a $200,000 bonus from Orange Broadcasting.

---

[4]The Court takes judicial notice of FCC records indicating that Aries purchased 94.3 FM and then transferred it to Orange Broadcasting in 1983.

**[*6]** Aries Communications Inc.

Aries and its two operating subsidiaries, Orange Broadcasting and North County Broadcasting, are known as the Aries Consolidated Group. The Aries Consolidated Group operated on a fiscal year that ran from September 1 through August 31. Petitioner was a cash basis taxpayer until it changed its method of accounting to the accrual basis in the year at issue. Petitioner filed consolidated Federal income tax returns from 1998 through at least 2008. Petitioner earned revenue by selling advertising spots on its radio stations.[5]

Orange Broadcasting

Orange Broadcasting was incorporated in 1976. From 1977 until 2003 Orange Broadcasting held the FCC license for 94.3 FM in Orange County, California. During the 1980s and 1990s Orange Broadcasting aired a country music radio station broadcast under the call letters KIKF. In 2000 Orange Broadcasting changed the station's format to an adult contemporary music station under the call letters KMXN.

On May 15, 2003, petitioner sold 94.3 FM to LBI Media and its subsidiary, Liberman Broadcasting, Inc. (Liberman), for $35 million. Petitioner engaged

---

[5]Petitioner sold 60-, 30-, and 10-second announcements and half-hour to hour programs.

[*7] Kalil & Co. (Kalil), a broker, to help sell 94.3 FM. Upon completion of the sale petitioner paid Kalil $790,000 in accordance with the brokerage agreement. Mr. Astor explained at trial that petitioner engaged the broker primarily to find prospective purchasers he might not know about. He referred the broker to potential purchasers he was aware of personally.

Mr. Astor was personally involved in garnering the first bid of around $18 to $20 million for 94.3 FM from Liberman. Mr. Astor knew that Liberman already owned 94.3 FM in the San Fernando Valley, and he explained to Liberman that the two stations together could form a quasi-Los Angeles station which would be much more valuable than the two stations separately. After several rounds of phone calls with Mr. Astor over the course of a year, Liberman advised that its final offer was $28 million. Thereafter, Kalil, at Mr. Astor's suggestion, sought and obtained a bid from Entravision of $33 million. With this bid in hand, Kalil and Mr. Astor held a telephone conference with Liberman where Mr. Astor explained that he would sell 94.3 FM only for $35 million. Liberman discussed this price with Mr. Astor and ultimately agreed to it.

[*8]  Orange Broadcasting's unaudited financial documents reflected the following net income (loss) and "Stockholders Equity" as of December 31 of each calendar year listed below.[6]

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Net income (loss) | ($1,771,765) | $25,891,031 | ($17,043,881) | ($1,532,436) |
| Stockholders equity | (2,099,723) | 23,765,122 | 6,721,242 | 4,376,865 |

North County Broadcasting

North County Broadcasting was incorporated in 1987.  North County Broadcasting owned three radio stations at the beginning of the year at issue:  AM 1000 with call letters KCEO, AM 1450 with call letters KFSD, and 92.1 FM with call letters KFSD (these were the stations originally purchased in 1987 with call letters KOWN).  Each of the three stations owned an FCC license to broadcast on its respective frequency across portions of San Diego County and Riverside County, California.

---

[6]All amounts have been rounded to the nearest dollar.  We note that these are unaudited financial documents and the numbers do not add up year to year.  We also note that on the balance sheets 2004 was the only year in which retained earnings was the same amount carried over from the prior December; however, it appears to be the wrong amount if the income or loss account was closed to retained earnings. Because the then-current 2004 calendar year income was negative in that year, when the loss is subtracted from the stockholders equity (assets - liabilities) the retained earnings apparently should be $23,765,122.

[*9]  In April 2004 North County Broadcasting sold certain assets of 92.1 FM, including FCC licenses, equipment, engineering data, and selected contracts to Jefferson-Pilot Communications (Jefferson-Pilot).  This sale did not include:  the Carlsbad Studio; certain equipment located there; vehicles, receivables, cash and cash equivalents; North County Broadcasting's name, programing materials and information; and North County Broadcasting's sales and marketing materials.

Before the sale the president of Jefferson-Pilot informally contacted Mr. Astor and offered $12 million for the station, which Mr. Astor rejected.  The president of Jefferson-Pilot then made a further offer of $15 million.  Mr. Astor also rejected this offer and informed Jefferson-Pilot that he wanted $18 million for the station.  After these negotiations petitioner again engaged Kalil to broker the sale of 92.1 FM for $18 million.  Upon the completion of the sale of 92.1 FM, petitioner paid Kalil $459,333.34.

North County Broadcasting's unaudited financial documents reflected the following net income (loss) and "Stockholders Equity" at the end of each calendar year listed below.[7]

---

[7]We again note that these are unaudited financial documents, and the trial record does not contain information on distributions to or equity contributions by shareholders; consequently, the Court is unable to verify the reported retained earnings.  The Court notes that reported retained earnings for the previous year plus

(continued...)

| [*10] | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Net income (loss) | ($1,269,102) | ($436,159) | $13,988,322 | ($113,102) |
| Stockholders equity | (7,286,271) | (7,731,116) | 6,204,662 | 4,430,601 |

Financial Results

Petitioner reported the following for TYE August 31, 1999 through 2006:

| TYE | Gross operating receipts | Taxable income | Net profit (loss) after taxes | Depreciation expense | Retained earnings |
|---|---|---|---|---|---|
| 1999 | $4,829,003 | ($817,104) | ($817,104) | $148,078 | ($3,533,253) |
| 2000 | 4,760,169 | (887,413) | (887,413) | 118,273 | (4,472,578) |
| 2001 | 5,400,873 | (1,172,231) | (1,172,231) | 123,768 | (6,004,001) |
| 2002 | 4,506,958 | (1,415,651) | (1,415,651) | 134,142 | (7,641,199) |
| 2003 | 2,922,013 | 14,596,284 | 9,587,585 | 147,291 | 12,262,495 |
| 2004 | 1,131,744 | 3,902,092 | [1]4,025,956 | 269,406 | 12,725,862 |
| 2005 | 1,341,503 | (1,742,547) | (1,742,547) | 108,396 | 9,618,745 |
| 2006 | 1,514,492 | (2,688,686) | (2,688,686) | 90,319 | 6,863,724 |
| Total | 26,406,755 | 9,774,744 | 4,889,909 | 1,139,673 | 19,819,795 |

[1]Petitioner was owed a tax refund of $123,864.

[7](...continued)
or minus reported net income does not always total reported retained earnings for the subsequent year.

[*11]   Although respondent disputes the characterization of the type of compensation, the parties stipulated that petitioner paid Mr. Astor the following compensation for TYE:

|  | Aug. 31, 2002 | Aug. 31, 2003 | Aug. 31, 2004 | Aug. 31, 2005 |
|---|---|---|---|---|
| Salary | $136,800 | $136,800 | $136,800 | $136,800 |
| Commissions | 123,205 | 68,035 | 62,474 | 56,347 |
| Bonus | -0- | 1,870,148 | 6,697,700 | -0- |
| Total | 260,005 | 2,074,983 | 6,896,974 | 193,147 |

Petitioner's Form 1120, U.S. Corporation Income Tax Return, page 4 balance sheet for 1998, the earliest return in the record, shows a common stock account balance of $280,000 at the beginning of the year and a common stock account balance of $120,000 at the end of the year.  Thereafter, all of petitioner's tax returns in the record report a common stock account balance of $120,000.

Petitioner guaranteed loans from Goldman Sachs Credit Partners L.P. to Orange Broadcasting (Goldman Sachs debt) from as early as the end of the calendar year 2001.  Mr. Astor had also personally guaranteed the Goldman Sachs debt.  The total debt was $20 million.  Petitioner's December 31, 2001, financial documents stated that petitioner and Goldman Sachs had entered into a forbearance agreement which required petitioner to sell some of the radio stations

[*12] to satisfy obligations under the Goldman Sachs debt before December 20, 2002. When the assets of Orange Broadcasting were sold, $32,784,836 of the $35 million gross proceeds was used to repay the Goldman Sachs debt, including $20 million of principal and $12,784,836 of interest.

For the year at issue Aries' Federal income tax return was prepared by Thoerner & Toma certified public accountants of Orange County. They have been preparing Mr. Astor's returns for 20 to 25 years. Aries' Federal income tax return for TYE August 31, 2004, claimed a deduction for compensation paid to Mr. Astor of $6,896,974.

Procedural Background

Respondent issued petitioner a notice of deficiency on September 15, 2010, disallowing $6,086,752 of petitioner's claimed $6,896,974 deduction for compensation paid to Mr. Astor and determining a deficiency of $2,676,002 and a section 6662(a) accuracy-related penalty of $535,200.40 for TYE 2004. Petitioner timely petitioned the Court on December 13, 2010. A trial was held on December 9, 2011, in Los Angeles, California.

Expert Report--Martin Wertlieb

After the petition was filed petitioner commissioned Martin Wertlieb to prepare a report on the amount of compensation, that in his opinion, petitioner

[*13] could have reasonably paid Mr. Astor in TYE August 31, 2004. Mr. Wertlieb has a bachelor of arts degree from the Baruch School of Business of the City College of New York and graduate studies in management at New York University and the University of California, Los Angeles. He has over 40 years of experience in the compensation and personnel field and has been an expert witness on reasonable compensation before the U.S. Tax Court and many other courts.

In reaching his conclusions, Mr. Wertlieb examined the financial statements of 10 publicly traded radio broadcasting companies. He calculated the pretax revenues of these companies and compared them to that of Aries. Mr. Wertlieb also compared the amount paid to Mr. Astor with the compensation paid to the CEOs of the publicly traded corporations. He believes that because the corporations are publicly traded and the compensation they pay is subject to the approval of the boards of directors and State and Federal regulators, that compensation represents arm's-length transactions.

Mr. Wertlieb explained in his report that fixed compensation tends to correlate to annual company sales or revenues.[8] Mr. Wertlieb applied a

---

[8]Mr. Wertlieb defined fixed compensation as annual salary and any special benefits provided to the individual. He defined variable compensation as annual bonuses and the value of any stock awards or long-term incentive payouts made during the year.

[*14] mathematical formula using the statistical technique of linear regression or "line of best fit" to show the correlation.[9] Mr. Wertlieb used the trend lines for the correlation of CEOs' fixed compensation to annual revenues at the 75th percentile range because of Mr. Astor's experience in the industry and his status as the owner/operator. Mr. Wertlieb also believes that variable compensation tends to correlate to the company's profitability. Mr. Wertlieb again used linear regression analysis to show the correlation. On the basis of this information Mr. Wertlieb believes that reasonable fixed compensation and reasonable variable compensation for Mr. Astor were as follows:

| TYE Aug. 31 | Fixed compensation | Variable compensation |
| --- | --- | --- |
| 2004 | $438,900 | $4,704,500 |
| 2003 | 443,400 | 3,192,900 |
| 2002 | 422,100 | -0- |
| 2001 | 360,200 | -0- |
| Total | 1,664,600 | 7,897,400 |

---

[9]Regression analysis is a statistical technique designed to determine the effect that one or more explanatory independent variables have on a single dependent variable. This method may allow an expert to test the causal relationship, if any, between the explanatory independent variables and the dependent variable.

[*15] <u>Expert Rebuttal Report--Andrew J. Caffrey, Ph.D.</u>

Respondent asked Dr. Caffrey to opine on the validity and usefulness of the regression analyses presented in Mr. Wertlieb's report. Dr. Caffrey has a bachelor of arts degree in mathematics and economics from the California State University, Bakersfield and a Ph.D. in economics from the University of California, San Diego. Dr. Caffrey is a staff economist for the Internal Revenue Service who receives an annual salary that is not dependent on the outcome of this case.

Dr. Caffrey came to four conclusions after reviewing Mr. Wertlieb's report: (1) Mr. Wertlieb's regressions are used to extrapolate rather than to interpolate;[10] (2) the inclusion of Clear Channel Communications (the largest of the publicly traded companies Mr. Wertlieb looked at) drives the results of the fixed compensation regressions; (3) on the basis of the P-values of the coefficients in all of the regressions, the coefficients are not useful; and (4) on the basis of the R-squareds of the regressions, the regressions do not explain the variation in either the fixed compensation or the variable compensation. Dr. Caffrey concluded that

---

[10]Dr. Caffrey believes that because the companies used in Mr. Wertlieb's analysis had uniformly higher revenues than Aries, the regressions are being used to make a prediction outside of the range of the observations (extrapolate) rather than to make a prediction inside the range of observations used (interpolate).

**[*16]** Mr. Wertlieb's regression analysis is not useful to make a positive conclusion about the reasonableness of Mr. Astor's compensation.

Expert Report--Mark R. Lipis

After the petition was filed respondent engaged Lipis Consulting, Inc., to opine on what constituted reasonable compensation for the owner/operator of the radio broadcast stations operated by Aries and its subsidiaries for TYE August 31, 2004. Mr. Lipis has a bachelor of science degree in economics from the Wharton School at the University of Pennsylvania and a master of business administration degree from the University of Chicago. He has been in the consulting field of compensation for more than 30 years serving clients in the public, private, and nonprofit sectors.

Mr. Lipis considered executive officer compensation and broadcaster gross income and profitability information from the National Association of Broadcasters (NAB) for the position of general manager and information from the Economic Research Institute. He then applied a 75% premium to those figures to account for the fact that Mr. Astor was not just the general manager of one station but also the president and CEO. The adjusted NAB figures are as follows:

| [*17] Survey section | Base-median | Total compensation --median | Total compensation with 75% premium |
|---|---|---|---|
| All Stations-- nationwide | $140,000 | $160,000 | $280,000 |
| Revenues $1-1.5 million | 105,000 | 125,000 | 218,750 |
| Revenues $1.5-2 million | 132,090 | 144,590 | 253,033 |
| Revenues $2-3 million | 144,000 | 170,000 | 297,500 |
| Pacific region | 189,250 | 222,500 | 389,375 |

Mr. Lipis averaged the total compensation with the addition of the 75% premium to arrive at $287,732 and compared it with Mr. Astor's 2004 compensation. Mr. Lipis then discounted the $287,732 backwards to compare it with Mr. Astor's compensation in 2003, 2002, and 2001. On the basis of this analysis, Mr. Lipis concluded that for the four years Mr. Astor was underpaid by a total of $173,114 if his bonus is not included; and if Mr. Astor's bonus was included then he was overpaid over four years by a total of $8,394,734.

Mr. Lipis also compared Mr. Astor's compensation with data from broadcast company proxies as reported by the Kenexa.com database. That data includes compensation amounts for several television and radio companies, all of which were much larger than Aries when measured by revenues. Mr. Lipis used

[*18] scattergrams and regression analysis to show the correlation between compensation and revenue, net income, and profit margin.

With respect to Mr. Astor's bonus, Mr. Lipis believed that the question to be answered was: "Assuming the owner acted as a consultant to Kalil, how much were his services worth to improve the $12 million offer to $18 million?" Mr. Lipis concluded that a reasonable success fee for securing the additional $6 million of value was $210,000. Mr. Lipis then combined all of his methods and concluded that the total reasonable compensation for Mr. Astor for 2004 was $635,447.

OPINION

I.    Burden of Proof

The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[11]

---

[11]Petitioner did not argue that the burden should shift to respondent under sec. 7491(a)(2); however, we have decided this case on the preponderance of the evidence.

**[*19]** II.     Reasonable Compensation

Respondent contends that most of the compensation paid to Mr. Astor was not reasonable under section 162 for TYE 2004 and, in the notice of deficiency, disallowed $6,086,752 of petitioner's claimed salary expense of $6,896,974. Petitioner contends that all of Mr. Astor's compensation was reasonable, that it included catchup payments for prior years in which Mr. Astor was undercompensated, and that he was entitled to a bonus for the sales, which he masterminded and facilitated, of the two radio stations.

A.     Overview of Section 162(a)(1)

Section 162(a)(1) provides a deduction for ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered". Absent stipulation to the contrary, an appeal in this case would lie to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1). Therefore, we follow that court's precedent. Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Ninth Circuit determines the deductibility of compensation through a two-prong test: the amount of compensation must be reasonable, and the payment must be purely for services rendered. Nor-Cal

[*20] <u>Adjusters v. Commissioner</u>, 503 F.2d 359, 362 (9th Cir. 1974), <u>aff'g</u> T.C. Memo. 1971-200; sec. 1.162-7(a), Income Tax Regs.

      B.      <u>Salary Payments</u>

            1.      <u>Catchup Compensation and Services Actually Rendered</u>

Compensation for prior years' services is deductible in the current year as long as the employee was actually undercompensated in prior years and the current payments are intended as compensation for past services. <u>R.J. Nicoll Co. v. Commissioner</u>, 59 T.C. 37, 50-51 (1972); <u>see also</u> <u>LabelGraphics, Inc. v. Commissioner</u>, 221 F.3d 1091, 1096 (9th Cir. 2000) ("an intention to remedy prior undercompensation can weigh in favor of reasonableness"), <u>aff'g</u> T.C. Memo. 1998-343. To the extent total compensation includes amounts that were actually for prior years of service, the total compensation need not be reasonable in the year it was paid. <u>Devine Bros., Inc. v. Commissioner</u>, T.C. Memo. 2003-15. Petitioner contends that the amount paid to Mr. Astor in fiscal year 2004 includes catchup amounts for the three prior years. Therefore, we shall evaluate the reasonableness of Mr. Astor's compensation for TYE August 31, 2001 through 2004.

**[*21]** There is no doubt that Mr. Astor was the most valuable employee of Aries and the compensation paid to him, or at least a portion thereof, was for services actually rendered.

### 2. Reasonableness of Payments

We consider the reasonableness of the compensation with reference to five broad factors set forth in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), rev'g T.C. Memo. 1980-282. No single factor is dispositive. Id. at 1245. The relevant factors are: (i) the employee's role in the company; (ii) a comparison of the employee's salary with salaries paid by similar companies for similar services; (iii) the character and condition of the company; (iv) potential conflicts of interest; and (v) internal consistency. Id. at 1245-1247.

We also consider an additional factor: whether an independent investor would be willing to compensate the employee as the taxpayer compensated the employee. Metro Leasing & Dev. Corp. v. Commissioner, 376 F.3d 1015, 1019 (9th Cir. 2004), aff'g 119 T.C. 8 (2002). The Court of Appeals notes that "the perspective of an independent investor is but one of many factors that are to be considered when assessing the reasonableness of an executive officer's compensation." Id. at 1021. The reasonableness of compensation is a question of fact to be determined on the basis of all the facts and circumstances. Pac. Grains,

[*22] <u>Inc. v. Commissioner</u>, 399 F.2d 603, 606 (9th Cir. 1968), <u>aff'g</u> T.C. Memo. 1967-7.

### i. Employee's Role in the Company

This factor looks to the overall significance of the employee to the company. <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1245. "Relevant considerations include the position held by the employee, hours worked, and duties performed, <u>American Foundry v. Commissioner</u>, 536 F.2d 289, 291-292 (9th Cir. 1976), as well as the general importance of the employee to the success of the company", <u>id.</u>

Mr. Astor was the hands-on owner-operator of Aries. Mr. Astor has been Aries' president, chief financial officer, and sole shareholder from its incorporation in 1983 and has acted as general manger of each of petitioner's radio stations. He was actively involved in managing many aspects of petitioner's day-to-day operations, including: (1) overseeing management personnel; (2) planning and overseeing programming; (3) negotiating and communicating with lenders; (4) participating in sales meetings; and (5) communicating with outside advisers. As the key employee, he played a pivotal role in the profitable sale of petitioner's major assets.

[*23] Respondent argues that the sale of Aries subsidiaries' assets was profitable not because of Mr. Astor's personal role but because of the significant appreciation of the FCC licenses. While we agree that the FCC licenses were the principal driving force behind the sale and the key component of the sale price of the subsidiaries, that does not necessarily diminish Mr. Astor's role as an employee of the corporation.

Mr. Astor made the decision to both acquire and maintain the FCC licenses. However, his role does raise an interesting issue. Did Mr. Astor invest in the licenses personally, as the passive owner/investor of Aries, or did he make the investment choices as a money-making strategy, in his employment capacity, as the chief executive of Aries? Respondent wants to disallow the deduction of most of Mr. Astor's salary and thus increase the tax of Aries. Had Mr. Astor personally purchased the FCC licenses and then transferred them to a corporate entity such as Aries or its subsidiaries, respondent's position might be well taken. However, the FCC licenses were acquired by the corporate entities, and the decisions of Mr. Astor should therefore be treated as the decisions of the chief executive of Aries. Aries should compensate Mr. Astor for his successful investment choices.

In a situation similar to that of the appreciation of the FCC licenses, market forces also helped create the cashflow enabling an employee's significantly

[*24] increased salary. In Shotmeyer v. Commissioner, T.C. Memo. 1980-238, we explained that one of the reasons the employee-owner's corporation was finally able to pay the manager a large salary was the conditions created by the Arab oil embargo. We noted that the "economic conditions were not the primary reason for the increase in salary." The primary reason was the taxpayer's "business acumen and experience".

Although petitioner did not have any substantial taxable income before the sale of two of its major assets, Mr. Astor, who was responsible for the assets, facilitated the sale of those assets for prices far exceeding the buyers' original offers. For the year before the year at issue petitioner's taxable income was $14,596,284, and for the year at issue its taxable income was $3,902,092. Both respondent's and petitioner's experts agree that Mr. Astor was petitioner's most important employee. Mr. Astor also facilitated the Goldman Sachs debt by way of his personal guarantee. See Leonard Pipeline Contractors, Ltd. v. Commissioner, T.C. Memo. 1998-315, aff'd without published opinion, 210 F.3d 384 (9th Cir. 2000).[12] We find this factor weighs in favor of petitioner.

---

[12]Respondent has not asserted a thin capitalization argument, and the Court shall not make one for him that petitioner would have no chance to rebut.

**[\*25]**         ii.         <u>Comparison With Similar Companies' Salaries</u>

The next relevant factor is a comparison of the employee's salary with those paid by similar companies providing similar services. <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1246; <u>Hoffman Radio Corp. v. Commissioner</u>, 177 F.2d 264, 266 (9th Cir. 1949). Mr. Astor explained that Aries was one of only a few companies in the industry in which the owner was also the operator. Therefore external comparisons are difficult, and each of the parties retained an expert to provide an opinion regarding reasonable compensation for Mr. Astor.[13]

The following table summarizes both expert opinions as to Mr. Astor's fixed reasonable compensation:

---

[13]We evaluate expert opinions in the light of each expert's demonstrated qualifications and all other evidence in the record. <u>See</u> <u>Parker v. Commissioner</u>, 86 T.C. 547, 561 (1986). We are not bound by an expert's opinions and may accept or reject an expert opinion in full or in part in the exercise of sound judgment. <u>See</u> <u>Helvering v. Nat'l Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Parker v. Commissioner</u>, 86 T.C. at 561-562. We may also reach a determination of value on the basis of our own examination of the evidence in the record. <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), <u>aff'g</u> T.C. Memo. 1974-285.

| [*26] TYE Aug. 31 | Respondent's expert | Petitioner's expert | Actual salary + commission |
|---|---|---|---|
| 2001 | $287,732 | $360,200 | $250,351 |
| 2002 | 277,733 | 422,100 | 260,005 |
| 2003 | 267,051 | 443,400 | 204,835 |
| 2004 | 255,063 | 438,900 | 199,274 |
| Total | 1,087,579 | 1,664,600 | 914,465 |

The following table summarizes both expert opinions as to Mr. Astor's variable reasonable compensation:

| TYE Aug. 31st | Respondent's expert | Petitioner's expert | Actual bonus |
|---|---|---|---|
| 2001 | -0- | -0- | -0- |
| 2002 | -0- | -0- | -0- |
| 2003 | -0- | $3,192,900 | $1,870,148 |
| 2004 | $210,000 | 4,704,500 | 6,697,700 |
| Total | 210,000 | 7,897,400 | 8,567,848 |

The tables indicate that the experts' opinions are very divergent. Both experts compared the compensation of executive officers in companies similar to Aries and then used linear regression as a tool to compare the companies' income with that compensation.[14]

---

[14]As mentioned previously, linear regression is a statistical technique that can

(continued...)

**[*27]**  Respondent called a rebuttal expert, Dr. Caffrey, to challenge the findings of Mr. Wertlieb, petitioner's expert.  Dr. Caffrey came to certain conclusions regarding Mr. Wertlieb's report.  The concerns we find relevant are:  (i) Mr. Wertlieb's report is premised on a model analysis that employs return on sales as its principal if not sole measure of financial performance; (ii) the regressions are used to extrapolate; (iii) on the basis of the p-values, the coefficients are not useful, and; (iv) on the basis of the R-squareds, the regressions do not explain the variation in either the fixed compensation or the variable compensation.  If those conclusions are true, these are factors that would describe the mathematical imprecision of the results of these regression models.  Consequently, they constitute arguments that require the Court to determine the proper weight to be accorded to the conclusions of the Wertlieb report.[15]

---

[14](...continued)
be used to estimate the correlation and effect between one or more independent variable(s) and another single dependent variable.  It can consequently also be useful for prediction.  In the case at hand it was used to estimate the correlation between executive compensation and revenues.

[15]See generally Barabin v. Asten-Johnson, Inc., 700 F.3d 428, 431 (9th Cir. 2012); Esgar Corp. v. Commissioner, T.C. Memo. 2012-35, slip op. at 30-32 (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 551 (1993), Fed. R. Evid. 702 and 703, and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999)), appeal filed (10th Cir. Sept. 6, 2012).  The Court has previously addressed these issues in greater detail in our order in this case filed December 27, 2011, in response to the

(continued...)

**[*28]** Dr. Caffrey explained that the regressions are used to extrapolate rather than interpolate because the data used for the comparison was acquired from companies much larger than Aries. Because of the nature of the radio industry, there are not very many companies whose financial information is public that are similar to Aries, and the experts must use the data available. In fact, respondent's own expert witness, Mr. Lipis, also used data from companies much larger than Aries, explaining that "all the companies were considerably <u>larger</u> than Aries Communications when measured by revenue yet I can still learn from their compensation practices".

Dr. Caffrey attempted to recreate Mr. Wertlieb's regression analysis, and then he listed the p-values for those re-creations.[16] Dr. Caffrey explained that

> [I]f the p-value is less than 0.05, then we can state that the beta coefficient is statistically different from zero "at the 5% significance level." The p-values generated from my replication attempts are 0.136 (2004), 0.105 (2003), 0.051 (2002), and 0.072 (2001). None of

---

[15](...continued)
motion in limine respondent filed on November 25, 2011, in an attempt to bar Mr. Wertlieb's direct testimony in the form of his previously submitted report.

[16]The "p-value" shows the "confidence intervals" or reliability of the regression's coefficient, that is, how wide the confidence interval around the beta coefficient is. If the confidence interval includes zero, there is no established ascertainable relationship between revenues and fixed compensation. The highest p-value Dr. Caffrey finds useful is 10%, which is also represented as 0.1.

[*29] these beta coefficients are statistically significant at the standard 5% significance level. The beta coefficients from the 2003 and 2004 regressions are not statistically significant even at the less rigorous 10% significance level.

Dr. Caffrey also objects to including the data from Clear Channel Communications as, in his opinion, it is an outlier. If it is included, the values would range from as low as 5.1% to as high as 13.6%. Although as the p-values demonstrate the regression analysis is not strong, we will accord them the proper weight in reaching our decision. However, we do not find the p-values make the regression analysis completely irrelevant in this case.

Dr. Caffrey was also concerned with Mr. Wertlieb's regression analysis because when he recreated the analysis, the R-squareds did not explain the variation in either the fixed compensation or the variable compensation.[17] Dr. Caffrey found R-squareds of 0.163, 0.206, 0.321, and 0.349 for TYE August 31, of 2004, 2003, 2002, and 2001, respectively. However, regarding his own regression analysis, respondent's expert, Mr. Lipis, explained:

> An indicator of the robustness of the regression equation [i.e. explanation of variation] is called the R-squared value; the higher the number (between 0.00 and 1.00), the stronger the equation. The R-squared value for the total compensation regression using the raw numbers was 0.19. The R-squared values for the two logarithmic

---

[17]R-squared is the measure of the explanatory power of a regression, i.e. how well it fits the data.

[*30] value regressions are 0.30 for total compensation and 0.16 for total annual compensation. None of the R-squareds is strong but still useful to know.

Mr. Lipis' R-squareds and the R-squareds Dr. Caffrey recreated from Mr. Wertlieb's data are similar and not very strong in describing the mathematical precision of the results of these regression models. Consequently, the Court will bear this in mind when determining the proper weight to attribute to these conclusions. Mr. Lipis' regression analysis explains the variation in either fixed compensation or variable compensation about as well (or as poorly) as Mr. Wertlieb's.

Both experts agree that with respect to Mr. Astor's fixed compensation for TYE August 31, 2001 through 2004, he was underpaid. Mr. Lipis determined that for those four years a total of $1,087,579 was reasonable compensation, and Mr. Wertlieb determined that a total of $1,664,600 was reasonable compensation. Mr. Astor was actually paid a total of $914,465. We find that, given the R-squareds and the p-values of both Mr. Wertlieb's and Mr. Lipis' regression analysis, both reports should be given equal weight. Therefore we shall average their two conclusions and find that for those four years a total of $1,376,090 would have been reasonable fixed compensation. Thus, Mr. Astor was underpaid by $461,625.

**[*31]** The greatest difference in opinion between the experts is with respect to Mr. Astor's bonus. Mr. Wertlieb found that when the receipts of a corporation increase, so do executive bonuses; using his regression analysis he found that for the receipts earned in TYE August 31, 2003 and 2004 Mr. Astor's bonus would have been reasonable at $3,192,900 and $4,704,500, respectively. Mr. Lipis took a different approach for his analysis of Mr. Astor's bonus and believed that the question to be answered was: "Assuming the owner acted as a consultant to Kalil, how much were his services worth to improve the $12 million offer to $18 million?" Mr. Lipis concludes that a reasonable success fee for securing the additional $6 million of value was $210,000.[18]

We do not entirely agree with either Mr. Wertlieb or Mr. Lipis. Mr. Wertlieb's regression analysis suffered from low R-squareds and high p-values, and Mr. Lipis undercompensated Mr. Astor for increasing the sale price by $6 million.

We note that "[t]o determine what is 'reasonable' compensation in any situation is a difficult task, given the various factors to consider, the unique aspects of every business, and the unavoidable tension between the rules of

---

[18]Mr. Lipis used the formula from the Kalil brokerage contract to determine the $210,000 ((5% x $3,000,000) + (2% x $3,000,000) = $210,000).

**[*32]** section 162 and the latitude allowed to business judgment." Clymer v. Commissioner, T.C. Memo. 1984-203, aff'd without published opinion sub nom. Dension Poultry & Egg Co. v. Commissioner, 775 F.2d 299 (5th Cir. 1985).  Mr. Astor, acting in his executive capacity, was responsible for increasing the sale price from $12 million to $18 million, or by 50%.  Mr. Astor also had significant involvement in his executive capacity, acquiring, managing, and selling the investment.  Given his dual status as shareholder and chief executive officer he would in all events, see Univ. Chevrolet Co. v. Commissioner, 16 T.C. 1452, 1455 (1951), aff'd, 199 F.2d 629 (5th Cir. 1952), have been motivated to obtain the highest sale price possible.  Nevertheless, his efforts as an employee are still entitled to reasonable compensation for services actually rendered.  In short, his executive efforts over a number of years permitted Aries to capitalize on this business opportunity.  Therefore "using our best judgment, based on all the evidence in the record", the Court finds that Mr. Astor's appropriate bonus would be one-third of the increase in the sale price, which is $2 million. See id.  This factor weighs against finding that Mr. Astor's variable compensation was reasonable and that petitioner may deduct the entire expense under section 162.

**[*33]** iii. <u>Character and Condition of the Company</u>

Under this factor we analyze the character and condition of the company, focusing on the company's size, complexity, net income, and general economic condition. <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1246.

Aries was a complex business holding multiple subsidiaries each with its own radio stations. Aries had gross receipts of over $4.5 million before it sold off some of its major assets. However, Aries was losing more and more money each year from 1999 to 2002 and immediately after the two years of major asset sales began losing money again. Respondent points out that Aries was deeply in debt when the asset sales occurred. Petitioner had guaranteed the Goldman Sachs debt of $20 million. And at trial Mr. Astor explained that the forbearance agreement was behind the sale of Orange Broadcasting. Orange Broadcasting would not have been able to continue as a going concern if the sale had not occurred.

One of the asset sales did occur during the year at issue, and during that year Aries was profitable because of that sale. Mr. Astor was responsible for the increased sale price of the assets and had managed to keep the wolves at bay before the sale of the assets so that Aries might enjoy the financial benefit from those asset sales. Nevertheless, as discussed <u>infra</u>, we note that even for the year at issue Aries' tax return reflects a $4,041,016 loan from Mr. Astor. The fact that

[*34] Aries basically had to borrow the bonus back from Mr. Astor in the year it was paid depicts a rather bleak financial condition and casts a shadow on the substance of the transaction, suggesting that Aries was thinly capitalized.

The economics at play here are enlightening. The value of assets such as the FCC licenses is generally determined by the discounted value of the future income stream the asset will produce. It is therefore curious that radio stations and FCC licenses with a history of operating losses were valued by purchasers at $35 million and $18 million. Apparently others believed that they could employ these assets much more profitably than their track record would suggest. This implies that either the stations were managed poorly or at least in the case of 94.3 FM, there was a synergistic effect and significant value was created when the coverage area was materially increased by combining the stations. Perhaps both these and other factors were at work. In any case the stations' financial performance lagged behind what would be expected from the use of assets with such significant value.

Because Aries was a large asset-laden complex business with a negative net income and a bleak financial picture despite the favorable fact that it enjoyed a successful asset sale during the year at issue, we find this factor favors respondent.

**[*35]**                    iv.      Potential Conflicts of Interest

This factor focuses on any indicia that there may be a conflict of interest. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246. Primarily we are concerned with whether a relationship exists between the employee and the company that may permit the disguise of nondeductible corporate distributions as salary expenditures. Id. Mr. Astor was an owner-operator. There was no specific evidence introduced that Aries ever paid or that he received a dividend, although the change in common stock from $280,000 to $120,000 and the Court's difficulties in reconciling retained earnings imply some distributions to stockholders may have occurred. Their character is not resolved by the record, and in the absence of accumulated or current year's earnings and profits it may have resulted in a tax-free return of capital. In any event it was incumbent on petitioner, who has the burden of proof, to clarify the facts if doing so was favorable to Aries.

Therefore a relationship did exist between Mr. Astor and Aries that could have permitted the disguised dividend distributions as salary expenditures. "The mere existence of such a relationship, however, when coupled with * * * [the] absence of dividend payments, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high." Id. When this is the case, we

**[\*36]** closely scrutinize the alleged salary payments and frequently evaluate the compensation from the perspective of a hypothetical independent investor. Id. at 1247.

Petitioner argues that Aries' return on equity resulted in an increase in shareholder equity from a $280,000 initial contribution in 1983 to $12,725,862 in TYE August 31, 2003. Respondent argues that this paints a rosier picture than petitioner's actual financial standing at that time. In TYE August 31, 2003 petitioner had $3,561,369 cash on hand after having paid off the Goldman Sachs debt that precipitated the sale, and in addition petitioner no longer owned some of its most valuable assets.

Both parties overstate and oversimplify their cases. Because of various interparty loans and the $20 million Goldman Sachs debt Mr. Astor personally guaranteed it is difficult to discern the true capital structure and equity status of the corporate entities. During the same years stated shareholder investment, ignoring negative retained earnings, was $120,000. However, when interparty loans are considered and unrealized asset appreciation is adjusted for, a quite different picture emerges. The Court has previously concluded that the real source of value here was the FCC licenses that made the Goldman Sachs loan possible. Mr. Astor's guarantee, we believe, added little other than its protection of the

**[*37]** value by including as an obligor the sole shareholder of the corporation holding the FCC licenses.

The following table reflects the interparty loans between Mr. Astor and Aries. This table suggests that other than Mr. Astor's investment in the, as of yet, unrealized appreciation in Aries' and its subsidiaries' assets, he had no capital investment at all. They were the corporation's assets, not his (ignoring his stock ownership), and provided the necessary security for the loans. Further, when the loans are scrutinized Mr. Astor had in practice already withdrawn his stated $120,000 equity and a material portion of the appreciation in Aries and its subsidiaries' assets.[19] Consequently, these facts must be considered in determining an investor's right to a reasonable return on investment.

---

[19] The "loans" may have been in substance dividends or distributions (only for years in which there was a profit) but were apparently reflected by interest-bearing notes; and although the notes were frequently refinanced with new notes, interest was paid and notes were paid. Respondent has, for whatever reason, chosen not to contest the shareholder loans for tax purposes.

| [*38] TYE Aug. 31 | Aries' loans to Mr. Astor | Loans from Mr. Astor to Aries |
|---|---|---|
| 1999 | $1,775,641 | -0- |
| 2000 | 2,715,399 | $740,016 |
| 2001 | 2,741,850 | 740,016 |
| 2002 | 2,739,045 | 740,016 |
| 2003 | 2,727,389 | 740,016 |
| 2004 | 2,727,389 | 4,041,016 |
| 2005 | 2,727,389 | 4,404,381 |

Mr. Astor shrewdly negotiated the sales of some of Aries' assets for prices much higher than initially offered and by paying off the Goldman Sachs debt kept the company a going concern and out of bankruptcy. An independent investor would have desired the highest prices for the assets and rewarded Mr. Astor for his work in securing those prices. However, as the owner of Aries Mr. Astor also had a significant interest in garnering the highest price for the assets and then receiving the reward as salary deductible by Aries instead of a nondeductible dividend. Mr. Astor had also been receiving a significant benefit from the loans from Aries, and we note that Mr. Astor was well compensated for his work in investing in and maintaining the major assets of Aries in the year immediately before the year at issue when the first major asset sale took place. Mr. Astor was

[*39] paid $2,074,983 in TYE August 31, 2003. These are precisely the conflicts of interest this factor seeks to avoid; therefore, we find this factor favors respondent.

### v. Internal Consistency

"[E]vidence of an internal inconsistency in a company's treatment of payments to employees may indicate that the payments go beyond reasonable compensation." Elliotts, Inc. v. Commissioner, 716 F.2d at 1247. And with respect to bonuses paid, we note that "Bonuses that have not been awarded under a structured, formal, consistently applied program generally are suspect * * * On the other hand, evidence of a reasonable, longstanding, consistently applied compensation plan is evidence that the compensation paid in the years in question was reasonable." Id.

In Vitamin Vill., Inc. v. Commissioner, T.C. Memo. 2007-272, the Court found that the bonuses paid were not awarded under a structured, formal, or consistently applied program; however, because they "were paid under the taxpayer's plan to award a bonus for present hard work and prior years' lack of compensation when the taxpayer became more profitable", Multi-Pak Corp. v. Commissioner, T.C. Memo. 2010-139, it found the factor to favor the taxpayer. Mr. Astor's bonuses were not paid under a structured or formal plan. Aries paid

[*40] Mr. Astor large bonuses in the years that it was able to afford them. We note, however, that the bonuses were determined at the end of the year when Mr. Astor and petitioner could reasonably predict Aries' profits and potential Federal income tax liability absent a section 162 deduction for Mr. Astor's compensation. This fact weighs in respondent's favor.

Another facet of this factor is the comparison of the owner-operator's compensation with that of other employees of the company. Elliotts, Inc. v. Commissioner, 716 F.2d at 1247. However, if the services provided by unrelated nonowner employees are not comparable in scope to the responsibilities of the owner-operator, the compensation paid such nonowner employees is not necessarily relevant to the reasonableness of the owner-operator's compensation. Clymer v. Commissioner, T.C. Memo. 1984-203.

Susan Burke served as the executive vice president and corporate secretary for both Orange Broadcasting and North County Broadcasting from 1996. Her duties included: FCC-related issues, labor and employment issues, music licensing, and review of documents and contracts. During the year at issue petitioner paid Ms. Burke $288,654, including a $200,000 bonus from Orange Broadcasting. Ms. Burke is the only employee with duties remotely similar to Mr. Astor's. Mr. Astor described Ms. Burke as his "Girl Friday" at trial. She was the

[*41] chief administrator of the business, and her duties are not comparable in scope to Mr. Astor's duties. Thus her compensation is not relevant to our analysis. Id.

Because Mr. Astor's compensation was not awarded under a structured, formal, consistently applied program, it was suspect. However, because we found supra that Mr. Astor's compensation included amounts for prior years of hard work for which he was undercompensated, we find this factor neutral.

### vi. Additional Factor: The Independent Investor

While we found supra that petitioner did intend Mr. Astor's compensation as catchup compensation for prior services rendered, in Elliotts, Inc. v. Commissioner, 716 F.2d at 1247, the Court of Appeals for the Ninth Circuit noted that

> If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Fn. ref. omitted.]

Petitioner's Form 1120, page 4 balance sheet for 1998, the earliest return in the record, shows a common stock balance of $280,000 at the beginning of the

[*42] year. We shall assume that the $280,000 is the investor's (in this case Mr. Astor's) initial investment. As we noted above, while petitioner argues that its return on equity resulted in an increase in shareholder equity from a $280,000 initial contribution in 1983 to $12,725,862 in TYE August 31, 2003, there may in substance have been no equity (other than unrealized appreciation in the corporate assets). Apparently, in a manner not revealed by the record, petitioner paid Mr. Astor some sort of distribution in 1998 because the common stock balance was reduced to $120,000 at the end of the year. Thereafter, all of petitioner's later tax returns in the record reflect a common stock balance of $120,000.

A reasonable investor would expect to receive a return on this initial investment and would not approve of a salary package that depleted the corporation's assets without paying the investor. Id. (a 20% return on equity "would satisfy an independent investor"); Thousand Oaks Residential Care Home I, Inc. v. Commissioner, T.C. Memo. 2013-10 ("return on investment of between 10% and 20% tends to indicate compensation was reasonable"); L & B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187 (investor would have been happy with either 6% dividend return plus 10% growth in retained earnings or 20% growth in shareholders' equity).

**[*43]**  As the cases above show, the Court has found that a return on investment of

10% to 20% tends to indicate compensation was reasonable.[20]  In <u>Miller & Sons</u>

<u>Drywall, Inc. v. Commissioner</u>, T.C. Memo. 2005-114, we explained that "this

Court has generally calculated a corporation's ROE [return on equity] by dividing

its net income after tax for a specific year by its shareholders equity" instead of

using compound growth rates.  <u>See</u> <u>B & D Founds., Inc. v. Commissioner</u>, T.C.

Memo. 2001-262 (discussing the ROE calculation in greater detail); <u>LabelGraphics,</u>

<u>Inc. v. Commissioner</u>, T.C. Memo. 1998-343.  For the reasons discussed below, we

will use petitioner's shareholder's equity at the end of TYE August 31, 2004, the

year in issue.  Because we have the specific financial information for Orange

Broadcasting and North County Broadcasting, we will analyze each subsidiary

separately.

---

[20]The Court takes judicial notice that in 1983 (when Mr. Astor purchased 94.3 FM) the prime interest rate was 11% and in 1987 (when Mr. Astor purchased 92.1 FM) the prime interest rate was between 7.75% and 8.75%.  A 10-year Treasury note had a 10.46% interest rate in 1983 and a 7.08% rate in 1987.

| [*44] | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| | | Orange Broadcasting | | |
| Net income (loss) | ($1,771,765) | $25,891,030 | ($17,043,881) | ($1,532,436) |
| Stockholders equity | (2,099,723) | 23,765,122 | 6,721,242 | 4,376,865 |
| ROE | 0.844 | 1.089 | (2.536) | (0.35) |
| | | North County Broadcasting | | |
| Net income (loss) | ($1,269,102) | ($436,159) | $13,988,322 | ($113,102) |
| Stockholders equity | (7,286,270) | (7,731,116) | 6,204,662 | 4,430,601 |
| ROE | 0.174 | 0.056 | 2.254 | (0.026) |

We note that Aries was made up of more than just Orange Broadcasting and North County Broadcasting and therefore analyze the ROE of Aries as a whole by deriving the following information from Aries' tax returns.

| TYE Aug. 31 | Net profit (loss) after taxes | Equity[1] | Return on equity |
|---|---|---|---|
| 2002 | ($1,415,651) | ($7,569,904) | 0.187 |
| 2003 | 9,247,098 | 12,333,790 | 0.750 |
| 2004 | [1]4,025,956 | 12,797,157 | 0.315 |
| 2005 | (1,742,547) | 9,690,040 | (0.180) |
| 2006 | (2,688,686) | 6,935,019 | (0.388) |

[1]Equity was determined by adding the common stock, additional paid in capital, and retained earnings stated on Aries' Form 1120 page 4 balance sheet.

[*45] We note that this method of determining the shareholders' return on investment is skewed because of the interparty loans and further skewed in the years in which the two subsidiaries sold major assets. Therefore under the specific facts of this case as discussed supra under the heading "Potential Conflicts of Interest", the corporation's ROE does not paint a very meaningful or accurate picture. In this case, the independent investor analysis is a weak factor, and the Court of Appeals for the Ninth Circuit explains that the independent investor test is only one of the many factors to be considered. Metro Leasing & Dev. Corp. v. Commissioner, 376 F.3d at 1021.

We find that using compound growth rates presents a more accurate picture. As the table supra page 10 shows, petitioner had negative income in every year in the record except for the two years in which petitioner had major asset sales. The record does not apportion the capital investment represented by the common stock of $280,000 or $120,000 among the multiple radio stations and subsidiaries of petitioner, and it indicates only that Mr. Astor's initial investment in 94.3 FM was $31,200. The record does not reveal what his initial investment in 92.1 FM was.

A 10% return on $280,000 compounded annually for 21 years (1983-2003) is roughly $2,072,069.98, a 15% return is $5,270,025, and 20% return is $12,881,434. We note that in 1998 $160,000 of the initial investment was

[*46] removed from the corporate books.  A 10% rate of return on $280,000 compounded annually for 16 years (1983-1998) is $1,286,592; then if we subtract the $160,000 and compound the rest for the final 5 years, the final return is $1,814,388.  The same calculation at 15 and 20% yields $5,270,025 and $12,881,434, respectively.  Because Aries was a highly leveraged business but possessed assets, such as the FCC licenses, likely to appreciate, a hypothetical investor might be satisfied with a 10% return on this investment.  Consequently, the corporation should have had at least $1,814,388 left for distribution after payment of the compensation packages.

Petitioner had a net income of $4,025,956 after taxes and the compensation packages were paid in the year at issue and retained earnings of $12,725,862.  Respondent argues that the large income was due to the substantial asset sales that occurred and that this level of income was not sustained.  In TYE August 31, 2005 and 2006 petitioner had a net income of ($1,742,547) and ($2,688,686), respectively.  Because petitioner had enough retained earnings to almost satisfy an investor even at 20% compounded annually after Mr. Astor's compensation was paid in 2004, we conclude this factor favors petitioner.

**[*47]**            vii.    <u>Conclusion</u>

After review of each factor discussed above, we hold that Mr. Astor's

compensation was not reasonable for TYE August 31, 2004, and that petitioner may

not deduct the entire amount of claimed compensation expense under section 162.

We found <u>supra</u> that Mr. Astor's fixed salary was underpaid for the four years we

reviewed by $461,625.  That amount, plus Mr. Astor's actual fixed salary of

$199,274 for the year at issue, plus the $2 million bonus that we found reasonable,

or a total of $2,660,899 is deductible as reasonable compensation for TYE August

31, 2004, under section 162.  We again note that the reasonableness of

compensation is a question of fact to be determined on the basis of all the facts and

circumstances.  <u>Pac. Grains, Inc. v. Commissioner</u>, 399 F.2d at 606.

III.    <u>Section 6662(a) Accuracy-Related Penalty</u>

Respondent contends that petitioner is liable for the section 6662(a) and

(b)(1) and (2) accuracy-related penalty for TYE August 31, 2004, because a

portion of petitioner's underpayment was due to either a substantial

understatement of income tax or negligence.  There is a "substantial

understatement" of income tax for any tax year where, in the case of corporations

(other than S corporations or personal holding companies), the amount of the

understatement exceeds the greater of (1) 10% of the tax required to be shown on

[*48] the return for the tax year or (2) $10,000. Sec. 6662(d)(1)(B). Section 6662(a) and (b)(1) also imposes a penalty for negligence or disregard of rules or regulations. Under this section "'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). Under caselaw, "'[n]egligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Regulations promulgated under section 6664(c) further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on the advice of a tax professional may, but does not necessarily, establish reasonable cause and good faith for the purpose of avoiding a section

**[\*49]** 6662(a) penalty.  See United States v. Boyle, 469 U.S. 241, 251 (1985) ("Reliance by a lay person on a lawyer [or accountant] is of course common; but that reliance cannot function as a substitute for compliance with an unambiguous statute.").

The caselaw sets forth the following three requirements for a taxpayer to use reliance on a tax professional to avoid liability for a section 6662(a) penalty:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), aff'g 121 T.C. 89 (2003).

Although at trial Mr. Astor stated that he "discussed the compensation that they thought was acceptable" with his accountants, he never explained what kind of information he provided to his accountants or whether he even relied on the accountants' judgment.  While Aries' Federal income tax returns were prepared by his accountants, none of them testified at trial.  Petitioner did not meet the three prongs of the Neonatology test, and therefore we do not find petitioner's reliance

[*50] on a tax professional reasonable cause for the underpayment attributable to Mr. Astor's compensation.

With respect to the $550,000 concession, petitioner presented no evidence that it acted with reasonable cause and in good faith. Therefore petitioner is liable for the section 6662(a) accuracy-related penalty.

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, the Court concludes that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered

under Rule 155.